******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* DARNELL MOORE
(AC 38624)

Beach, Keller and Norcott, Js.

*Argued September 20—officially released November 29, 2016*

(Appeal from Superior Court, judicial district of New London, Jongbloed, J.)

*Allison M. Near*, for the appellant (defendant).

*David J. Smith*, senior assistant state's attorney, with whom, on the brief, was *Michael L. Regan*, state's attorney, for the appellee (state).

*Opinion*

KELLER, J. The defendant, Darnell Moore, appeals from the judgment of conviction, rendered following a jury trial, of murder in violation of General Statutes § 53a-54a. The defendant claims that the trial court improperly (1) denied his motion to strike the jury panel and (2) denied his motion to suppress evidence. We affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found that during the evening of August 26, 2010, in the vicinity of Lake Street in Norwich, the defendant and the victim, Namdi Smart,[1] became embroiled in an argument over liquor. The defendant, known as "Boo" or "Boo-Boo," was accompanied during this initial altercation by his friend, Tjamel Hendrickson, known as "Soda Pop." During the course of the loud, verbal dispute, the victim ripped the defendant's T-shirt. As the defendant walked away from the scene, he was observed pointing to the victim, and was overheard uttering an expletive and stating that he would return to "get" the victim.

Shortly thereafter, Hendrickson called Samuel Gomez on the telephone. He requested that Gomez come to Norwich with a firearm. Gomez drove to Spaulding Street in Norwich, where he met with Hendrickson and the defendant. Gomez handed a .45 caliber handgun to the defendant. Gomez drove the defendant and another man, Jordan Brown, to the vicinity of Lake Street so that the defendant could search for the victim. After the defendant identified the victim, the three men returned to Spaulding Street for a period of time. Thereafter, Gomez drove the defendant and Brown to yet another location, where Gomez parked his automobile. The defendant exited the automobile and, within a few minutes, he shot the victim on Lake Street, causing his death. The shooting was witnessed by three bystanders who lived near the scene of the shooting: Kimberly Harris, Roslyn Hill, and Laryssa Reeves. The defendant, who was dressed in a black hooded sweatshirt, a black hat, a black mask, and jeans, returned to the automobile still in possession of the gun that Gomez had delivered to him. The defendant gave possession of the gun to Brown, who later exited the automobile with it. Gomez drove the defendant to his mother's residence before returning to New London.

Subsequent to these events, the police arrested the defendant on a murder charge. Following a trial before a jury, the defendant was found guilty, and the court sentenced him to serve a fifty-three year term of incarceration. This appeal followed. Additional facts related to the claims raised in this appeal will be set forth as necessary.

I

The defendant's first claim is that the trial court

improperly denied his motion to strike the voir dire panel. He argues (1) that the trial court improperly rejected his argument that the voir dire panel did not reflect a fair cross section of the judicial district from which it was drawn, in violation of the sixth amendment to the United States constitution; (2) that the trial court improperly rejected his argument that the jury selection procedure violated his right to equal protection guaranteed by the United States constitution; and (3) that this court should exercise its supervisory authority "to mandate that the jury administrator collect demographic data so that it is able to follow the statutory directive to prevent [discrimination] in jury selection." (Internal quotation marks omitted.) We disagree.

The following additional facts are relevant to this claim. Jury selection in the defendant's case commenced on November 14, 2012. At that time, defense counsel noted for the record that the defendant was an African-American and that, of the twenty venirepersons brought to the courtroom that day, there were no African-Americans. Defense counsel stated: "I have no basis to claim that there was any systemic effort to exclude people of color I noted. So, it's available for other purposes and on the record."

As jury selection progressed, on November 16, 2012, defense counsel stated for the record that, of sixty-eight venirepersons in the case to that point, "we've not had one African-American male and, to my knowledge, there's been one woman of color, who we did select as juror number five . . . ." Defense counsel stated, in relevant part: "I don't think there's a systemic effort on the part of the state to suppress African-American jury participation, but there certainly is an inadequate effort made to assure it." After observing that the defendant was entitled to a jury composed of his peers, defense counsel stated that he was "now on the cusp of raising this as an issue."

On November 27, 2012, defense counsel made further observations with respect to the nature of the venirepersons. He stated that out of four venire panels in the case to that point in time, consisting of ninety-nine venirepersons, there were only two "people of color, both women. We've not had one black male." Defense counsel stated his belief that 14 percent of the population in Connecticut was African-American and that "the venire that we're getting day by day is not representative of a fair cross section of the community." Stating his belief that the racial composition of the venire panels was possibly accidental, but not intentional, defense counsel stated that "there is a disparate impact in the manner in which juries are being selected, apparently, at this time in this county because I'm not seeing any of my client's peers." Responding to the observations made by defense counsel, the prosecutor stated that, although the venirepersons generally did not appear to

be racial peers of the defendant, he did not have enough information about such venirepersons to address the issue of their race. The court stated that it would address the issue if requested to do so by the defense.

On November 28, 2012, the defense filed a written objection to the composition of the venire panels and a request for an evidentiary hearing "whereby the jury administrator [in New London County] may testify as to how the jury venires are [assembled] to determine whether the defendant's sixth and fourteenth amendment rights to a fair and impartial jury are being infringed." The defendant argued that, of approximately 100 venirepersons, there were two African-American women and, to his belief, one male "who appeared to have African-American features," but referred to himself in his jury questionnaire as both Hispanic and Latin American. In his memorandum of law, defense counsel argued that more information was necessary before the defense could set forth a prima facie case that the defendant's rights under the sixth amendment had been violated because the venire panels were not representative of a fair cross section of the community. Specifically, the defendant argued that "it needs to be determined how many potential jurors are in both the state and in the county, and how those potential jurors are then organized into venires. Without this information, we cannot determine whether there is systemic exclusion that accounts for the underrepresentation of African-Americans in the defendant's jury venire in violation of his sixth and fourteenth amendment rights." Defense counsel and the prosecutor requested that the court mark the completed, confidential jury questionnaires in the present case as court exhibits, and the court did so. Attached as exhibits to the defendant's memorandum of law were demographic statistics compiled by the United States Census Bureau. The defendant cited to these exhibits to demonstrate that, in 2011, Connecticut's population was 11.1 percent African-American and that New London's population was 6.5 percent African-American. At the subsequent hearing on the defendant's motion, these exhibits were admitted into evidence absent objection. At the conclusion of the court proceeding on November 28, 2014, defense counsel observed that, once again, the venire panel brought to the courtroom that day did not include any African-American men.

On December 4, 2012, the court held an evidentiary hearing on the defendant's motion. At that time, defense counsel orally amended his motion to request that the court strike the venire panel. In addition to the confidential jury questionnaires that had been marked as a court exhibit, as well as the census data, the defense presented testimony from six witnesses: Sam Hannan, Esther Harris, Monica Endres, Robert Brothers, Louis Bucari, and Lynn Blackwell.

Hannan, the information technology manager for jury administration, testified with respect to the manner by which he compiles a master list of jurors for the Judicial Branch. He testified that, in compliance with state law,[2] he generates this master list by compiling information from "source list[s]" obtained from four sources: the Department of Revenue Services, the Department of Motor Vehicles, the Department of Labor, and the registrars of voters of each town. Hannan testified that nothing in the information at his disposal provides him with any information with respect to race or ethnicity. Moreover, he testified that he is unaware of any discussions within the jury administrator's office as to whether the master list is likely to produce an adequate and statistically representative cross section of the community as potential jurors. Hannan went on to testify that persons who fail to report for jury duty in compliance with their summonses to do so are automatically referred to the attorney general's office, but he was unable to provide any information with respect to the racial or ethnic characteristics of such persons. Hannan testified that, to his knowledge, there have never been any efforts by his office to systematically exclude members of a certain race from the jury pool.

Harris, the jury administrator for the Judicial Branch, testified that her duties included summoning jurors, selecting jurors, and utilizing jurors for the superior courts in the state. She stated that she does not collect statistics with respect to the racial characteristics of jurors because she is not required to collect such information. Harris acknowledged that the confidential jury questionnaire that is provided to jurors affords prospective jurors the option of providing information concerning their race, but that the form expressly states that jurors need not furnish such information if they find it objectionable to do so.[3] When asked if she was "aware of any tool, any procedure, any policy in the Judicial Branch that assures that the list of potential jurors generated from each town reflects the racial composition of that town," Harris responded that she was not aware of any. Harris testified that, to her knowledge, neither she nor anyone in her office had systematically excluded persons from the jury selection process on the basis of their race.

Endres, the jury clerk for New London, testified that she collects questionnaires from those jurors who report for jury duty, but that she does not require them to provide information concerning their race and that she does not record such data. She testified that she has no way of knowing the race of persons who are summoned for jury duty. Endres testified that she does not systematically exclude anyone from being a potential juror on the basis of their race.

Brothers, the executive director of the Commission on Human Rights and Opportunities, testified that his

office did not maintain any racial statistics with respect to persons who file income tax returns, persons who register motor vehicles, persons who file for unemployment compensation, or persons who register to vote. Bucari, the first assistant commissioner and general counsel for the Department of Revenue Services, testified that his office did not maintain any information with respect to the racial characteristics of persons who file income tax returns. Lynn Blackwell, an employee of the Department of Motor Vehicles, testified that the department did not collect any data with respect to racial characteristics.

The parties stipulated that the secretary of the state did not possess any data with respect to the racial characteristics of registered voters and that there was no way for the secretary of the state to determine the racial composition of the lists provided to the jury administrator. Moreover, the parties stipulated that although the attorney general has the authority to bring enforcement actions against nonappearing jurors, the attorney general had not pursued a case of juror delinquency for at least three years. Finally, the parties stipulated that the Department of Labor did not maintain data with respect to the racial or gender characteristics of recipients of unemployment compensation.

At the conclusion of the hearing, defense counsel argued that, of approximately 120 prospective jurors in the present case, it appeared that there were three African-American women and no African-American men. Defense counsel stated that the defense did not intend to argue that there was "any systemic effort to exclude people of color" from the venire pool. Nonetheless, defense counsel argued, he believed that the defendant had a viable cross-section claim under the sixth amendment as well as an equal protection claim because of the lack of diversity in the venire pool and, particularly, the absence of any African-American men in the venire pool. Defense counsel, relying on the census data, argued that African-Americans generally were vastly underrepresented in the venire pool in light of state and New London County demographics, and stated that "the question is [whether] this is an isolated snapshot, does it reflect some larger systemic issue. I can't know that and there is no way, based on the evidence that is available to [the defendant], that he can know that, and the reason he can't know that is the state refuses to keep that data." Also, defense counsel argued that the Judicial Branch, bound by statute "to assure a nondiscriminatory [venire] panel," had seemingly demonstrated its "wilful blindness" with respect to the issue by not compiling or maintaining data with respect to the racial composition of venire panels. He went on to argue that there seemingly had been a lack of any commitment to ensure "any people of color in this panel . . . ."

The prosecutor objected to the defendant's motion on the ground that, in light of the lack of racial and ethnic information for many of the venirepersons at issue, the defendant had failed to demonstrate that the state had substantially underrepresented a particular group of prospective jurors. Moreover, the prosecutor argued, the defendant had not demonstrated any wilful or systematic discrimination by way of the race-blind procedures employed in the present case.

By way of a thorough and well reasoned memorandum of decision, the court denied the defendant's motion to strike the venire panel. The court discussed in detail the evidence presented by the defendant at the hearing on the motion. Among its findings, the court stated: "A total of 117 potential jurors appeared in Norwich throughout the jury selection process . . . . On a number of occasions during jury selection, counsel for the defendant observed that there were no males who appeared to be African-American on the Norwich jury panels. Counsel observed that there were a total of three females who appeared to be African-American (one of whom was selected to serve on the jury) and one male who indicated on his questionnaire that he was Hispanic/Latino."

The court also found: "No jurors are systematically excluded on the basis of race. None of the witnesses who testified had any way of knowing the racial makeup of the jurors summoned for jury duty in this or any other case other than [from] the information provided voluntarily on the confidential juror questionnaire, which is available for use during voir dire of the particular individual and not retained or recorded."

In addressing the defendant's sixth amendment fair cross section claim, the court observed that, under *Duren* v. *Missouri*, 439 U.S. 357, 364, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979), the defendant bore the burden of proving that "(1) the group claimed to be excluded is distinctive in the community, (2) the representation of the group in the jury pool is not fair and reasonable in relation to the number of members of the group in the community, and (3) the underrepresentation is the result of systematic exclusion of the group in the jury selection process." (Internal quotation marks omitted.)

The court, assuming for purposes of its analysis that African-American males were distinctive in the community, stated that "the defendant has presented no evidence of any statistical analysis to support his claim and no evidence from which the court could conclude any degree of underrepresentation. He points to census data showing that black people represent 6.5 percent of the population of New London County and 11.1 percent of the state of Connecticut. . . . He observed that three jurors in the pool were females who appeared to be African-American or who represented themselves as

such on the questionnaire. He concedes that he offered no other data as to the racial makeup of the panel or the percentage of the group in the pool, claiming the information was simply not available. The witnesses testified credibly that no information was maintained as to the racial or ethnic makeup of jurors reporting for jury duty in this judicial district. Although there is a section on the confidential jury questionnaire where jurors may enter that information voluntarily, they are not required to do so. The defendant argues that the action of the state in failing to record or require such information effectively precludes him from satisfying his burden. The defendant, however, provides no authority in support of his contention that the state is required to maintain information on how jurors identify themselves racially, and the court declines to find such a requirement. The defendant has therefore failed in his proof, having offered insufficient evidence of the racial makeup of the jury pool or any statistical support for the claim that the group is underrepresented in the pool.

"Even if, however, the court were to find that the group was underrepresented or that the actions of the state in failing to maintain records concerning the racial composition of jury pools precluded the defendant from meeting his burden in this regard, his claim nevertheless fails because he specifically concedes that he has not shown systematic exclusion of any group in the jury selection process. Inasmuch as the defendant has failed to establish this third prong of the proof required . . . his challenge to the array on this ground fails.

"The defendant's claim that failure to take action with regard to delinquent jurors leads to underrepresentation of a distinctive group also fails since there is no evidence before the court as to the racial makeup of delinquent jurors or any evidence that the representation of jurors from a distinctive group would be affected by enforcement action." (Citation omitted.)

In addressing the equal protection aspect of the defendant's claim, the court observed that, under *Castaneda* v. *Partida*, 430 U.S. 482, 494, 97 S. Ct. 1272, 51 L. Ed. 2d 498 (1977), the defendant could establish his claim by proof of "(1) underrepresentation of a recognizable group; (2) substantial underrepresentation over a significant period of time; and (3) a selection procedure susceptible to abuse or not racially neutral." (Internal quotation marks omitted.)

In rejecting the defendant's claim, the court stated: "This claim fails . . . because the third prong . . . requires proof of discriminatory intent. . . . The defendant has conceded that he has not shown discriminatory intent. Here . . . the defendant has produced no evidence that Connecticut's jury selection system is capable of deliberately and systematically denying African-American males the opportunity to be selected for jury

service by excluding them from jury arrays. . . . Thus, the failure to show discriminatory intent requires denial of the defendant's equal protection claim." (Citations omitted; internal quotation marks omitted.)

A

We first address the defendant's fair cross section claim. "Fair cross section claims are governed by a well established set of constitutional principles. In order to establish a violation of his federal constitutional right to a jury drawn from a fair cross section of the community, the defendant must demonstrate the following: (1) that the group alleged to be excluded is a distinctive group in the community; (2) that the representation of his group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under-representation is due to systematic exclusion of the group in the jury-selection process. . . . [I]n a fair cross section claim, the defendant need not prove intent. [S]ystematic disproportion itself demonstrates an infringement of the defendant's interest in a jury chosen from a fair community cross section. The only remaining question is whether there is adequate justification for this infringement." (Citations omitted; internal quotation marks omitted.) *State* v. *Gibbs*, 254 Conn. 578, 588, 758 A.2d 327 (2000).

"[W]e review the [trial] court's factual determinations relevant to the defendant's Sixth Amendment . . . challenge for clear error . . . but we review de novo the court's legal determination whether a prima facie violation of the fair cross section requirement has occurred." (Internal quotation marks omitted.) Id., 592.

The defendant has not undermined our confidence in the factual determinations reached by the trial court or in the correctness of its legal analysis of the claim. The defendant failed to present evidence to demonstrate that the representation of African-American males in venires from which juries are selected was not fair and reasonable in relation to the number of such persons eligible to serve as jurors in the community. It suffices to observe that defense counsel provided the court with his best guess with respect to the race and ethnicity of all of the prospective jurors at issue in the present case, but did not provide the court with competent evidence of the racial and ethnic characteristics of all of the prospective jurors.[4] Additionally, to the extent that the defendant argues that there is substantial underrepresentation in the entire New London jury pool, he did not even purport to provide the court with any evidence with respect to the racial and ethnic composition of that jury pool generally. Furthermore, the only evidence that arguably was relevant to demonstrating the proportion of African-American males who should have been part of venires that represented a fair cross section of the community, was the general census

data on which the defense relied. Yet this census data provided information with respect to the percentage of *all* African-Americans in Connecticut and New London County. Thus, it was not probative with respect to the inquiry at issue, which necessarily focuses on the percentage of African-American males that are eligible for jury service. In light of the dearth of evidence with respect to the relevant factors at issue in the present claim, we conclude that the defendant has not demonstrated that the court erroneously rejected his fair cross-section claim.

B

Next, we address the defendant's equal protection claim. "An equal protection violation in jury selection procedures may be established by proof of (1) underrepresentation of a recognizable group; (2) substantial underrepresentation over a significant period of time; and (3) a selection procedure susceptible to abuse or not racially neutral." (Internal quotation marks omitted.) Id., 594. "Although the equal protection test is similar to the cross section test, the critical difference is that in an equal protection claim the defendant must prove *discriminatory purpose*." (Emphasis added.) *State* v. *Castonguay*, 194 Conn. 416, 421, 481 A.2d 56 (1984).

As discussed in part I A of this opinion, the defendant failed to demonstrate that substantial underrepresentation of African-American males had occurred. Thus, it follows that he also failed to demonstrate that any underrepresentation had occurred over a significant period of time. Moreover, the court found, and we agree, that the defendant failed to present any evidence to demonstrate that the jury selection system was capable of abuse in the manner suggested. The undisputed evidence presented by the defendant reflected that Judicial Branch officials were unaware of the racial and ethnic characteristics of persons summoned for jury duty and that, to the extent that prospective jurors voluntarily provided information related to their race or ethnicity on their confidential juror questionnaire, such information was not retained or recorded. Finally, the defendant failed to present any evidence that discriminatory intent exists. In the course of argument defense counsel stated to the trial court that the defense lacked any basis upon which to suggest that there was a systemic effort to exclude any potential jurors from jury arrays. In light of the defendant's failure of proof, the court correctly rejected his equal protection claim.

C

Last, the defendant urges this court, in the exercise of its supervisory authority over the administration of justice, "to enforce the collection of demographic data to permit analysis of the diversity of jury panels in Connecticut."

"Supervisory authority is an extraordinary remedy that should be used sparingly . . . . Although [a]ppellate courts possess an inherent supervisory authority over the administration of justice . . . [that] authority . . . is not a form of free-floating justice, untethered to legal principle. . . . Our supervisory powers are not a last bastion of hope for every untenable appeal. They are an extraordinary remedy to be invoked only when circumstances are such that the issue at hand, while not rising to the level of a constitutional violation, is nonetheless of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . Constitutional, statutory and procedural limitations are generally adequate to protect the rights of the defendant and the integrity of the judicial system. Our supervisory powers are invoked only in the rare circumstance [in which] these traditional protections are inadequate to ensure the fair and just administration of the courts. . . . Overall, the integrity of the judicial system serves as a unifying principle behind the seemingly disparate use of our supervisory powers. . . . Thus, we are more likely to invoke our supervisory powers when there is a pervasive and significant problem . . . or when the conduct or violation at issue is offensive to the sound administration of justice . . . ." (Internal quotation marks omitted.) *State* v. *Fuller*, 158 Conn. App. 378, 392, 119 A.3d 589 (2015).

The defendant asserts that the requested remedy is necessary to ensure that the Judicial Branch is able to follow its statutory mandate "to enforce nondiscrimination in jury selection . . . ." General Statutes § 51-232 (c).[5] The defendant argues that "[t]he need to acknowledge the defendant's right to a jury reflecting a fair cross section of the community, and to encourage the public trust in the jury process requires that action be taken to address the lack of diversity in jury panels such as the one here."

We decline to grant the defendant the extraordinary remedy that he seeks. As a preliminary matter, the defendant's request is supported by an unproven premise, namely, that the jury panels at issue in the present case reflected significant underrepresentation of a recognized group or were not representative of a fair cross section of the community. Moreover, it is difficult to discern how the relief sought by the defendant—the collection of information related to the race and ethnicity of *all* prospective jurors—would comport with the plain language of § 51-232 (c), which expressly states that prospective jurors need not provide such information.[6]

II

Next, the defendant claims that the court improperly denied his motion to suppress evidence relating to iden-

tifications of him that were made to the police by several witnesses. The defendant argued that the identifications were the result of the use of impermissibly suggestive photographic array procedures. We disagree.

The following facts are relevant to the present claim. Defense counsel raised the suppression motion orally, prior to trial. The court held a hearing related to the motion on November 30, 2012, and December 6, 2012. At the hearing, the court heard testimony from Sergeant Patrick Mickens, Sergeant Corey Poore, Detective James Curtis, and Officer Greg McDonald, all of the Norwich Police Department. In its thorough memorandum of decision related to the motion to suppress, the court explicitly stated that it had credited as true the testimony of these witnesses. The court made the following findings of fact: "Mickens responded to the scene of a shooting on Lake Street in Norwich in the late evening of August 26, 2010, having been notified by [Harris] . . . whom he knew as a confidential informant [and] with whom he had worked for at least a year. She was upset and crying, and stated that she had just seen someone shot in front of her. Sergeant Mickens took [Harris] in his unmarked car directly to the Norwich Police Department. She was placed in an interview room, [and] provided with something to drink and tissues. After she had composed herself, she was interviewed. She did not speak to anyone on the way to the police department. Mickens showed her two [photographic] arrays together with written witness instructions in the early morning hours of August 27, 2010. On one (Defendant's Exhibit A), she identified an individual she knew to be 'Boo' in photograph number 2. On the other (Defendant's Exhibit B), she identified an individual she knew to be 'Soda Pop' in photograph number 7. Harris signed and initialed both [photographic] arrays. . . .

"McDonald . . . testified that he was assigned to investigate the shooting on Lake Street on August 26, 2010. He stated that he maintained a database of street names and was assigned to meet with two witnesses who wished to meet at a location other than the Norwich Police Department. On August 27, 2010, McDonald met with two witnesses, Denise Djedje and [Hill], in a secluded area near a church parking lot. He separated the witnesses, that is, while he spoke with Djedje, Hill was standing farther away drinking coffee and having a cigarette. He had no concerns that his conversations with one were overheard by the other. He showed Djedje two [photographic] arrays together with the written witness instructions for [photographic] identification (Defendant's Exhibit D). In one, she identified the person in photograph number 2 as 'Boo,' and stated [that] she was '100 percent positive he did the shooting.' In the other, she identified the person in photograph number 7 as 'Soda Pop.' Djedje signed and initialed both arrays. Similarly, Hill was shown two [photographic]

arrays with instructions (Defendant's Exhibit E). In one, she identified the person in photograph number 2 as 'Boo,' stating, '[t]hat's Boo. One hundred percent positive.' In the other, she identified the person in photograph number 7 as 'Soda Pop.' Hill signed and initialed both [photographic] arrays.

"Norwich police Sergeant Corey Poore testified that he was assigned to the investigation into the shooting death on Lake Street in Norwich on August 27, 2010. As part of his assignment, he showed a [photographic] array with written witness instructions to [Reeves] on August 31, 2010. He testified that Reeves came to the police department voluntarily to provide information. She identified the person in photograph number 2 as " 'Boo' and the person who I saw shoot 'Big Man.' " (Defendant's Exhibit F.) She signed and initialed the [photographic] array. Sergeant Poore testified that [Reeves] was fearful and she was placed into hiding.[7] Poore also showed a [photographic] array with written witness instructions to Tjamel Hendrickson. (Defendant's Exhibit G.) This array differed from the array reflected in defendant's exhibits A, D, E, F and I. On that [photographic] array, Hendrickson identified the person in photograph number 2 as 'S.A.' and stated under witness comments regarding identification: 'S.A. is the same person I saw walk down the street toward Lake Street just before the murder. S.A. came back a short time later by himself.' (Defendant's Exhibit G.) Hendrickson signed and initialed the array. . . .

"Norwich police Detective James Curtis testified that he was assigned to the investigation into the shooting on August 26, 2010, and arrived at the crime scene shortly before midnight. In the early morning hours of August 27, 2010, he showed [photographic] arrays to two individuals at the Norwich Police Department, namely, Ms. Hutchinson and [Hendrickson], also known as 'Soda Pop.' These two arrived at the police department independently. Detective Curtis first interviewed Ms. Hutchinson, who then left.[8] Approximately ninety minutes later, Hendrickson was brought into the police department by Officer Delmar Carter and Mickens. Hendrickson was shown a [photographic] array and pointed to the individual in photograph number 2. He answered affirmatively that the person in photograph number 2 was the person known to him as 'Boo-Boo.' (Defendant's Exhibit I.) He signed and initialed the array. . . .

"Each of the five individuals who made the identifications reflected in defendant's exhibits A, D, E, F and I, also placed their initials next to each line of the written witness instructions for [photographic] identifications. The instructions specifically stated that '[t]he person you saw *may or may not* be in these photographs.' Defendant's Exhibits A, D, E, F and I all reflect the same [photographic] array in which the defendant is depicted at position number 2." (Emphasis in original;

footnotes altered.)

The court aptly summarized the argument advanced by the defendant in support of his motion to suppress the identification evidence, in which he essentially asserted that anything other than a "random presentation" in each of the photograph arrays rendered the identifications unreliable, as follows: "The defendant makes the sole claim that the identification procedures followed here were impermissibly suggestive because in each array shown to the witnesses in which he was identified, the defendant's photograph appeared in the same position, that is, position number 2. He argues that there was no effort on the part of law enforcement to ensure that the witnesses had no contact with each other and that the procedures followed created a risk that people will repeat what they have heard from others."

After setting forth relevant legal principles governing the claim, the court stated its reasoning as follows: "The court finds that there was no evidence that the [photograph] arrays or the procedure employed in obtaining the identifications were unnecessarily suggestive. The actions of the law enforcement officers in obtaining the identifications were appropriate in all respects. The defendant's photograph was not prominently displayed or highlighted, and proper instructions were given to the witnesses, who were each interviewed individually. Specifically, each of the witnesses was advised of the procedure in writing, and placed their initials next to each of the instructions, including the instruction that the person they saw 'may or may not' be in the photographs. . . . There was no evidence that officers were anything other than neutral in administering the identification procedure, and the defendant makes no claim that the officers attempted to influence the witnesses in making their identifications. The officers in fact made efforts to separate the witnesses, and no identifications were made or even attempted in the presence of or within earshot of other witnesses. There was no evidence that the witnesses had contact with each other, or attempted to have contact with each other, concerning the identification. Indeed, the only claim made here is that the witnesses were shown arrays in which the defendant appeared in the same position, position number 2. There is no requirement under the circumstances presented here that the officers reconfigure [photograph] arrays shown to different witnesses." (Citation omitted.) Having concluded that there was no evidence that the identifications resulted from an unnecessarily suggestive procedure, the court denied the motion to suppress.

"[T]he standard of review for a motion to suppress is well settled. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]hen a

question of fact is essential to the outcome of a particular legal determination that implicates a defendant's constitutional rights, [however] and the credibility of witnesses is not the primary issue, our customary deference to the trial court's factual findings is tempered by a scrupulous examination of the record to ascertain that the trial court's factual findings are supported by substantial evidence." (Internal quotation marks omitted.) *State* v. *Kendrick*, 314 Conn. 212, 222, 100 A.3d 821 (2014). In contrast, "[when] the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts set out in the court's memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Mitchell*, 296 Conn. 449, 458, 996 A.2d 251 (2010).

"Due process requires that [eyewitness] identifications [may be admitted at trial] only if they are reliable and are not the product of unnecessarily suggestive police procedures. . . . Because reliability is the linchpin in determining the admissibility of identification testimony . . . a two part test has developed to make that determination. . . . In determining whether identification procedures violate a defendant's due process rights, the required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on examination of the totality of the circumstances. . . .

"Therefore, [t]he critical question . . . is what makes a particular identification procedure suggestive enough to require the court to proceed to the second prong and to consider the overall reliability of the identification. . . . [T]he entire procedure, viewed in light of the factual circumstances of the individual case . . . must be examined to determine if a particular identification is tainted by unnecessary suggestiveness. The individual components of a procedure cannot be examined piecemeal but must be placed in their broader context to ascertain whether the procedure is so suggestive that it requires the court to consider the reliability of the identification itself in order to determine whether it ultimately should be suppressed. . . . In making this determination, the court should focus on two factors. The first factor concerns the composition of the photographic array itself. In this regard, courts have analyzed whether the photographs used were selected or displayed in such a manner as to emphasize or highlight the individual whom the police believe is the suspect. . . . The second factor, which is related to the first but conceptually broader, requires the court to examine the actions of law enforcement personnel to determine whether the witness' attention was directed to a suspect because of police conduct. . . . In considering this

[factor, the court should] look to the effects of the circumstances of the pretrial identification, not whether law enforcement officers intended to prejudice the defendant. . . . It stands to reason that police officers administering a photographic identification procedure have the potential to taint the process by drawing the witness' attention to a particular suspect. This could occur either through the construction of the array itself or through physical or verbal cues provided by an officer. . . . The failure of a police officer to provide an affirmative warning to witnesses that the perpetrator may or may not be among the choices in the identification procedure is one circumstance that may increase the likelihood of a mistaken identification. . . .

"[A] challenge to a trial court's conclusion regarding whether the pretrial identification procedure was unnecessarily suggestive presents a mixed question of law and fact. . . . [B]ecause [however] the issue of the reliability of an identification involves the constitutional rights of an accused . . . we are obliged to examine the record scrupulously to determine whether the facts found are adequately supported by the evidence and whether the court's ultimate inference of reliability was reasonable. . . . [W]e will not disturb the findings of the trial court as to subordinate facts unless the record reveals clear and manifest error." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Outing*, 298 Conn. 34, 47–50, 3 A.3d 1 (2010), cert. denied, 562 U.S. 1225, 131 S. Ct. 1479, 179 L. Ed. 2d 316 (2011).

Before this court, the defendant reiterates the claim that he raised before the trial court. His claim is based on the undisputed evidence that the same array, with his photograph in position number two, was shown to each of the witnesses at issue. In challenging the trial court's resolution of his motion to suppress, however, the defendant sets forth a discrete argument; he argues that the trial testimony of Reeves undermined the court's finding that the witnesses did not have contact with each other concerning their identification of the defendant by means of the photograph arrays.

As set forth previously, among the findings made by the court in support of its conclusion that the identifications were not the result of an identification procedure that, as the defendant claims, was unnecessarily suggestive because of the fact that the identical photograph array was shown to several witnesses who may have had contact with one another concerning the composition of the array, was that "[t]here was no evidence that the witnesses had contact with each other, or attempted to have contact with each other, concerning the identification." In accordance with the standard of review set forth previously in this opinion, we must scrupulously examine the entire record, including the trial testimony on which the defendant relies, to deter-

mine whether the court's finding is supported by substantial evidence.

The defendant does not challenge the court's detailed findings of fact related to the testimony of Mickens, McDonald, Poore, and Curtis with respect to the manner in which they administered the photograph arrays at issue. As set forth previously in this opinion, the court found that on August 27, 2010, the day following the shooting, McDonald met with Djedje and Hill in a church parking lot, where he showed photograph arrays to each witness separately, and neither was able to hear or observe how the other's identification procedure was being conducted. Each witness identified the defendant in position number two. The court found that, on August 31, 2010, Poore met with Reeves at the police department, where he showed her a photograph array. Reeves identified the defendant in position number two. There was no claim raised by the defendant that the photograph arrays themselves were inherently suggestive. Having reviewed the evidence presented at the suppression hearing, we agree with the court that there was no evidence that the police had attempted to influence the witnesses or that the police administered the arrays in such a manner that the identification of one witness could have influenced the identification of another witness. There was no evidence presented at the suppression hearing that the identification made by any witness had been influenced by another witness.

The defendant draws our attention to the trial testimony of Reeves and, because of our obligation to scrupulously examine the entire record to determine whether the trial court's findings are supported by substantial evidence, we will examine that testimony. By way of establishing her familiarity with the defendant, Reeves testified that, prior to the time of the shooting, she had been in the defendant's presence and that she had made "[s]mall talk" with him. She testified that she observed the defendant and the victim engaged in an argument and, later that evening, she observed the defendant shoot the victim.

During cross-examination, Reeves testified that in the five days between the shooting and the time that she provided information to the police, she discussed the shooting incident with Hill and Djedje, with whom she was residing. The following colloquy between defense counsel and Reeves occurred:

"Q. . . . But you did get a chance in the five days that passed between the shooting to talk about this case with [Hill] and [Djedje], correct?

"A. Yes.

"Q. How often did you talk about it with them?

"A. I only said what I saw.

"Q. I didn't ask you that. How often did you talk with

them about it?

"A. I only probably said it about once.

"Q. About once?

"A. Yes."

After defense counsel established that, following the shooting, Reeves had resided with Hill and Djedje, the following exchange occurred:

"Q. And this was a shocking event, correct?

"A. Yes.

"Q. An event that you certainly talked about more than once as you tried to process the horror of seeing a man die before your very eyes; isn't that right?

"A. I really did not mention it too much because of how scared I was.

"Q. Hmm?

"A. I did not come up with it too many times because of how scared I was. I used to keep a lot of things in.

"Q. Okay. Okay. Did they talk about it while you listened?

"A. Not too much, but they did with them alone. But I never added into the conversation.

"Q. So, you never heard anything?

"A. I heard things, but I just never really studied it to the point where I wanted to listen to it."

Although the defendant characterizes Reeves' testimony as evidence that her pretrial identification of the defendant was influenced by conversations that she had with Hill and Djedje, following their pretrial identifications of the defendant, a careful review of Reeves' testimony does not reasonably support such an inference. At no point did Reeves testify that Hill, Djedje, or anyone else had discussed their identifications of the defendant with her or with anyone else. There simply is no basis on which to presume that anyone discussed the photograph arrays that had been shown to Hill, Djedje or any other witness, or that any prior identification had influenced that made by Reeves. Not surprisingly, Reeves testified that the shooting itself had been a topic of conversation, at least in one instance, between herself, Hill, and Djedje. We reject the defendant's interpretation of this testimony as evidence that Reeves was exposed to any information with respect to the photograph arrays shown to other witnesses. Accordingly, the defendant is unable to demonstrate that the court's findings were not supported by substantial evidence or that the denial of his motion to suppress was erroneous.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] There was evidence that the victim also was known as "Big Man."

[2] See General Statutes § 51-222a.

[3] The language on the questionnaire states: "Pursuant to [General Statutes § 51-232 (c)] information concerning race and ethnicity is required solely to enforce nondiscrimination in jury selection. The furnishing of this information is not a prerequisite to being qualified for jury service. This information need not be furnished if you find it objectionable to do so."

[4] We observe that a great number of the confidential juror questionnaires that were marked as court exhibits do not reflect any information with respect to the race and ethnicity of the prospective jurors, and that the record does not otherwise furnish a basis upon which to ascertain the race and ethnicity of every prospective juror.

[5] General Statutes § 51-232 (c) provides: "The Jury Administrator shall send to a prospective juror a jury confirmation form and a confidential juror questionnaire. Such questionnaire shall include questions eliciting the juror's name, age, race and ethnicity, occupation, education and information usually raised in voir dire examination. The questionnaire shall inform the prospective juror that information concerning race and ethnicity is required solely *to enforce nondiscrimination in jury selection*, that the furnishing of such information is not a prerequisite to being qualified for jury service and that such information need not be furnished if the prospective juror finds it objectionable to do so. Such juror confirmation form and confidential juror questionnaire shall be signed by the prospective juror under penalty of false statement. Copies of the completed questionnaires shall be provided to the judge and counsel for use during voir dire or in preparation therefor. Counsel shall be required to return such copies to the clerk of the court upon completion of voir dire. Except for disclosure made during voir dire or unless the court orders otherwise, information inserted by jurors shall be held in confidence by the court, the parties, counsel and their authorized agents. Such completed questionnaires shall not constitute a public record." (Emphasis added.)

[6] The defendant does not expressly argue that this court should direct the jury administrator to collect such information for *all* prospective jurors. Yet, if this court were to direct the jury administrator to collect such information from only those jurors who voluntarily provide it, the resulting data, reflecting information concerning some but not all prospective jurors, would not provide an accurate basis on which to assess the racial and ethnic characteristics of prospective jurors as a whole.

[7] At the suppression hearing, Poore testified that Reeves was "placed into hiding" for an indeterminate period of time because she feared for her physical safety. Poore did not explain in detail what "placed into hiding" entailed, except to state that "it wasn't anything that was provided by the city or the state. It was more just kind of a safe haven for [Reeves]."

[8] The court further stated in its memorandum of decision: "The state represented that it did not intend to offer evidence concerning Ms. Hutchinson's identification."