******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# DARNELL MOORE *v.* COMMISSIONER OF CORRECTION
## (AC 45842)

Elgo, Moll and Clark, Js.

*Syllabus*

The petitioner, who had previously been convicted, following a jury trial, of murder, sought a writ of habeas corpus, claiming that the state had violated his right to due process during his underlying criminal trial by failing to disclose an alleged cooperation agreement with G, who had been with the petitioner on the day of the murder and who testified at the petitioner's criminal trial. At the petitioner's habeas trial, the respondent, the Commissioner of Correction, introduced testimony from G, G's former attorney, and three prosecutors who were involved in the petitioner's underlying criminal trial and sentencing, all of whom testified that there was no formal or informal agreement or understanding between G and the state prior to or during the petitioner's trial. The habeas court denied the petitioner's petition for a writ of habeas corpus but granted certification to appeal. While the petitioner's appeal was pending, he filed a motion for rectification and/or augmentation of the record, seeking to include additional transcripts from the prosecution of G and G's court file. The habeas court denied the motion, finding, inter alia, that the petitioner was improperly seeking to create a record, rather than rectify the existing record. The petitioner filed with this court a motion for review of the habeas court's denial of his motion, and this court granted the motion for review but denied the relief requested therein. *Held*:

1. The petitioner could not prevail on his claim that the habeas court erred in rejecting his claim that the state violated his right to due process by failing to disclose an alleged cooperation agreement with G to the defense and by knowingly soliciting allegedly false and misleading testimony from G and allowing that testimony to stand uncorrected: contrary to the petitioner's assertions, the transcripts from G's sentencing hearing that the petitioner submitted as exhibits during his habeas trial did not contradict the testimony of the witnesses who testified at the habeas trial because, although the transcripts from that hearing revealed that the prosecutor informed the court that it was supporting a relatively lenient disposition in consideration for the testimony that G had given at the petitioner's criminal trial, he did not state or imply that the state had reached an agreement or understanding with G at the time of the petitioner's criminal trial; moreover, the habeas court was not required to infer such an agreement or understanding under the circumstances of this case and, on the basis of the record in this case, the habeas court's finding was not clearly erroneous.

2. This court declined to revisit its prior ruling on the petitioner's motion for review or to take judicial notice of certain materials that were never submitted to the habeas court: the petitioner's arguments on appeal were nearly identical to those he made before this court in his motion for review, and this court has made clear that it will order a hearing pursuant to *State* v. *Floyd* (253 Conn. 700) only in the unusual situation in which a defendant was precluded from perfecting the record due to new information obtained after judgment; moreover, if this court were to grant the petitioner's request and consider evidence that was not reviewed by the habeas court or by the state, even though the petitioner had the opportunity to present such evidence, the result would be trial by ambuscade.

Argued April 15—officially released August 20, 2024

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *M. Murphy, J.*; judgment denying the petition, from which the petitioner, on the granting of certification, appealed to this court. *Affirmed.*

*Denis J. O'Malley III*, assistant public defender, for the appellant (petitioner).

*Danielle Koch*, assistant state's attorney, for the appellee (respondent).

*Opinion*

CLARK, J. The petitioner, Darnell Moore, appeals following the granting of his petition for certification to appeal from the judgment of the habeas court denying his petition for a writ of habeas corpus. The petitioner claims that (1) the habeas court erred in rejecting his claim that the state violated his right to due process during his underlying criminal trial by (a) failing to disclose an alleged cooperation agreement with a witness who testified at his criminal trial and (b) knowingly soliciting that witness' allegedly false and misleading testimony and allowing that testimony to go uncorrected, and (2) this court should (a) revisit its prior

ruling on his motion for review and grant the relief requested therein to supplement the record in this appeal with transcripts and a court file from a witness' criminal case that were not before the habeas court, or, in the alternative, (b) take judicial notice of those materials. We conclude that the habeas court properly denied the petitioner's petition for a writ of habeas corpus on the ground that the petitioner failed to prove that the state violated his due process rights, and we decline the petitioner's invitation to revisit this court's prior ruling on his motion for review or to take judicial notice of materials that were not before the habeas court. Accordingly, we affirm the judgment of the habeas court.

The following facts, as set forth by this court in the petitioner's direct appeal and as found by the habeas court, are relevant to our resolution of this appeal. "[D]uring the evening of August 26, 2010, in the vicinity of Lake Street in Norwich, the [petitioner] and the victim, Namdi Smart,[1] became embroiled in an argument over liquor. The [petitioner], known as 'Boo' or 'Boo-Boo,' was accompanied during this initial altercation by his friend, Tjamel Hendrickson, known as 'Soda Pop.' During the course of the loud, verbal dispute, the victim ripped the [petitioner's] T-shirt. As the [petitioner] walked away from the scene, he was observed pointing to the victim, and was overheard uttering an expletive and stating that he would return to 'get' the victim.

"Shortly thereafter, Hendrickson called Samuel Gomez on the telephone. He requested that Gomez come to Norwich with a firearm. Gomez drove to

---

[1] "There was evidence that the victim also was known as 'Big Man.' " *State* v. *Moore*, 169 Conn. App. 470, 473 n.1, 151 A.3d 412 (2016), appeal dismissed, 334 Conn. 275, 221 A.3d 40 (2019) (certification improvidently granted).

Spaulding Street in Norwich, where he met with Hendrickson and the [petitioner]. Gomez handed a .45 caliber handgun to the [petitioner]. Gomez drove the [petitioner] and another man, Jordan Brown, to the vicinity of Lake Street so that the [petitioner] could search for the victim. After the [petitioner] identified the victim, the three men returned to Spaulding Street for a period of time. Thereafter, Gomez drove the [petitioner] and Brown to yet another location, where Gomez parked his automobile. The [petitioner] exited the automobile and, within a few minutes, he shot the victim on Lake Street, causing his death. The shooting was witnessed by three bystanders who lived near the scene of the shooting: Kimberly Harris, Roslyn Hill, and Laryssa Reeves. The [petitioner], who was dressed in a black hooded sweatshirt, a black hat, a black mask, and jeans, returned to the automobile still in possession of the gun that Gomez had delivered to him. The [petitioner] gave possession of the gun to Brown, who later exited the automobile with it. Gomez drove the [petitioner] to his mother's residence before returning to New London." (Footnote in original.) *State* v. *Moore*, 169 Conn. App. 470, 473–74, 151 A.3d 412 (2016), appeal dismissed, 334 Conn. 275, 221 A.3d 40 (2019) (certification improvidently granted).

The petitioner subsequently was arrested and charged with murder in violation of General Statutes § 53a-54a. On December 11, 2012, at the petitioner's criminal trial, the state offered Gomez as a witness. "[Counsel for the petitioner, Attorney Norman] Pattis informed the court that 'Gomez was arrested pursuant to a warrant. That warrant was perfected on May 19, 2011, and he was charged with a series of crimes related to his conduct in this case, including carrying a pistol or revolver without a permit and hindering prosecution in the second degree. The warrant was signed by Judge Kwak and bond was set in the amount of $100,000.

That case is open and pending in . . . the New London Superior Court. It's my understanding that [Gomez] intends to testify. I asked the state whether there was any understanding or cooperation agreement. . . . [T]he state says that his counsel, meaning Attorney [Peter] Catania, has not been given any assurances whatsoever even that favorable consideration could be expected from the state in the event that his client testified truthfully here.' . . .

"Pattis argued that 'competent and capable counsel would [not] permit . . . a client facing felony charges to testify basically inculpating himself in the very offense for which he stands trial without any understanding from anyone, whether it be the state or the judge, that his client would be given favorable consideration.' . . . Pattis requested permission to call Catania as a witness 'to inquire of him not of that information which is privileged—to wit, what he may or may not have said to his client—but on the scope of his conversation with members of the state's attorney's office and potentially with the presiding judge in the New London district.' . . . The state, represented by [Assistant State's] Attorney David Smith, objected to this request, which the court denied. . . .

"Pattis extensively cross-examined Gomez. . . . The cross-examination often focused on eliciting from Gomez some acknowledgment that he was receiving a benefit from the state in exchange for his testimony. Gomez answered 'no' when asked if anyone had led him to believe that testifying might benefit him. . . . Pattis asked Gomez why he had not yet pleaded guilty to his pending charges and if he committed those offenses. . . . Gomez admitted that he had committed the charged offense but did not answer why he had not resolved the charges. . . . Catania requested a recess so that he could advise Gomez about invoking his rights. After the trial resumed, Gomez answered that he did

not know why the charges had not been resolved and that he was still going to court for his cases. . . . At the conclusion of his cross-examination, Pattis asked Gomez if he 'fully intend[ed] to cut a deal with the state after [his] testimony in this case' and if what he was 'hoping for in this case is that the testimony [he] offer[ed] helps [him] out at sentencing. . . . Gomez answered [that] he was 'hoping for the best' and 'yeah.' '' (Citations omitted.)

On December 19, 2012, the jury found the petitioner guilty of murder in violation of § 53a-54a, and, on March 5, 2013, the court, *Jongbloed, J.*, sentenced the petitioner to a total effective sentence of fifty-three years of incarceration. See *State* v. *Moore*, supra, 169 Conn. App. 474. The petitioner appealed from his conviction to this court, which affirmed the trial court's judgment of conviction. Id., 499.

"On March 14, 2013, Gomez pleaded guilty pursuant to *North Carolina* v. *Alford*, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970), to one count of hindering prosecution in the third degree in violation of General Statutes § 53a-167. Attorney Stephen Carney, the prosecutor, stated the supporting facts and informed the court that his 'recommendation in regards to this matter [was] five years, suspended, with three years [of] probation. Your Honor, we make the recommendation with the acknowledgement that [Gomez] did testify at the trial regarding [the petitioner], as I indicated. And I understand that [Smith] found his testimony to be both credible and highly probative, and I believe that the conviction was secured largely because this individual came forward with some peril to himself and gave forthright information to the jury. We are, in consideration, recommending a fully suspended sentence then.' . . . The court canvassed Gomez, accepted his plea, and continued the matter for sentencing and a presentence investigation report. Catania indicated for the record that 'for

[Pattis'] benefit . . . there [were] no prior deals, prior to today, nothing arranged with the state. I know [Pattis] carried on quite a bit on the record during . . . [the petitioner's] trial that I must have been an idiot or struck a deal with the state; one or the other, and—despite the request of [Pattis] that I be forced to get on the stand and testify during that—that trial, I didn't have the chance to defend myself.' . . .

"On June 21, 2013, with Attorney Paul Narducci filling in for Carney, Gomez was sentenced in accordance with his plea agreement and the state nolled all other charges in three part B cases. . . . Narducci told the court that he had 'spoken with [Carney] on this. Your Honor is fully aware with the underlying factual basis for this. [Carney] informs me that as part of an agreement [Gomez] has pled to the hindering prosecution [charge].' " (Citations omitted.)

The petitioner commenced this habeas action in 2015. On April 29, 2021, he filed the operative third amended petition for a writ of habeas corpus, which contained three counts, one of which is relevant to this appeal. In the third count, the petitioner alleged prosecutorial misconduct stemming from Gomez' testimony at the petitioner's criminal trial. Specifically, the petitioner alleged that "the state failed to disclose exculpatory information regarding an informal agreement or understanding or an expectation of leniency between the state and [Gomez] regarding favorable consideration in exchange for his cooperation in testifying at the petitioner's trial." The petitioner also alleged that "the state knowingly solicited Gomez' false testimony concerning not receiving any consideration for his testimony and allowed this testimony to stand uncorrected."[2]

---

[2] The first and second counts alleged ineffective assistance on the part of his criminal trial counsel, Pattis, in (1) failing to impeach the testimony of Hill, and (2) failing to investigate and/or present favorable witnesses. As to count one, the court found that the petitioner "failed to show that Pattis' decision was deficient performance and that he was prejudiced." As to count

A habeas trial was held on March 30, 2022, at which the petitioner testified and presented the testimony of Pattis, Gomez, Catania, Carney, Smith, and Narducci.[3] "At the habeas trial, Gomez, Catania, and several prosecutors—Carney, Smith, and Narducci—testified about the plea agreement between Gomez and the state. Gomez denied being approached by any of the three prosecutors regarding a plea agreement. On cross-examination, Gomez denied approaching the state and offering his testimony in exchange for consideration in his criminal cases. Gomez acknowledged that his attorney had never told him that he had been offered a deal in exchange for his testimony but that he did hope that his testimony would be looked upon favorably in his cases. According to Catania, Gomez was not offered a plea agreement or leniency by the state, and there were no plea discussions, prior to or during the petitioner's trial. The state promised nothing to Gomez, who cooperated with the hope that he would secure a benefit later. On cross-examination, Catania answered '[t]hat's correct' when asked if the petitioner's prosecutor would not even discuss a plea bargain agreement until after the petitioner's criminal case was complete.

"Carney confirmed that no plea offer was made to Gomez prior to the petitioner's trial, nor that he personally solicited favorable testimony from Gomez. According to Carney, he recommended the sentence Gomez was to receive because it took into consideration the fact that Gomez had testified against the petitioner. Although Carney could not recall precisely when he made the plea offer to Gomez, he was certain that

two, the court found that the petitioner had "not presented any evidence [to] [substantiate] the claim that Pattis failed to investigate and call witnesses." The petitioner has not appealed with respect to either of these two counts.

[3] The petitioner also moved into evidence numerous transcripts from his criminal case and three transcripts from Gomez' criminal case, which were admitted in full.

it was not made before or during the petitioner's trial. Carney also noted that the prosecutors in the New London office did not communicate amongst each other about a plea agreement before or during the petitioner's trial. There was a definite effort by the prosecutors to not make an offer to Gomez regarding his testimony to avoid coloring or influencing his testimony in any way.

"On cross-examination, Carney confirmed that he has a duty to disclose exculpatory evidence and plea bargain agreements made with cooperating witnesses. Carney indicated that he follows the policies of the Division of Criminal Justice and his ethical obligations. Thus, Carney would not make a deal with a cooperating witness without disclosing [it] to opposing counsel, nor would he disclose potential sentences with such a witness out of concern that the testimony would be tailored. Carney stated that he would not disclose such information to the witness' attorney because there would be no way to prevent counsel from sharing that information with their client and potentially result in tailored testimony.

"Smith, who prosecuted the petitioner, indicated that he was not aware of any offer, plea arrangement, or informal agreement made by the state with Gomez in exchange for his testimony. Smith further indicated that he did not make any offers, plea arrangements, or informal agreements with Gomez, nor could he recall any communications among the prosecutors in New London regarding a plea agreement for Gomez. Smith was aware that another prosecutor in his office was handling the Gomez case, did not delve into the topic of offers with him, and kept his case against the petitioner separate from Gomez' case. Smith recalled having a conversation with Carney long after the petitioner's criminal trial was over.

"On cross-examination, Smith also acknowledged that he is aware of his ethical obligation to disclose

plea agreements made with cooperating witnesses and that he abides by that obligation. Smith confirmed that he would not have offered consideration to Gomez in exchange for his testimony because he was not prosecuting Gomez and, therefore, not responsible for determining the sentence communicated in an offer.

"Lastly, Narducci, who stood in for Carney at Gomez' sentencing, did not have any knowledge or recollection of how Gomez related to the petitioner's trial. Narducci was not aware of, nor did he recall, any communications among the New London prosecutors about Gomez' plea agreement. Additionally, Narducci had no recollection of having any discussions with Smith about Gomez."

On August 8, 2022, the habeas court, *M. Murphy, J.*, rendered judgment denying the petition. As to count three, the court found that "[t]he evidence in this case, contrary to the petitioner's contention, does not support the conclusion that there was any agreement, whether formal or informal, between the state and Gomez in exchange for his testimony. The testimony from Gomez, his former attorney, and three prosecutors, which the court finds credible both individually and collectively, does not show the existence of any agreement or understanding between Gomez and the state. There is no evidence of an express intention by the state not to prosecute Gomez, nor is there evidence of even an informal understanding or unexpressed intention.

"Consequently, the claim that the state failed to disclose an informal agreement or understanding or expectation of leniency between the state and Gomez must fail. There also is no evidence that the state knowingly solicited false testimony from Gomez about not receiving any consideration for his testimony and allowing his false testimony to stand uncorrected. The claim in count three is denied." The court subsequently granted

the petition for certification to appeal. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

On appeal, the petitioner claims that the habeas court erred in rejecting his claim that the state violated his right to due process by (1) failing to disclose an alleged cooperation agreement with Gomez to the defense and (2) knowingly soliciting Gomez' allegedly false and misleading testimony and allowing that testimony to stand uncorrected. The respondent, the Commissioner of Correction, argues that the petitioner failed to prove the existence of any implied agreement or understanding between Gomez and the state and, thus, the petitioner's due process claim fails. We agree with the respondent.

We begin by setting forth our standard of review and the relevant legal principles implicated by the petitioner's claim. "The law governing the state's obligation to disclose exculpatory evidence to defendants in criminal cases is well established. The defendant has a right to the disclosure of exculpatory evidence under the due process clauses of both the United States constitution and the Connecticut constitution. *Brady* v. *Maryland*, 373 U.S. 83, 86, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); *State* v. *Simms*, 201 Conn. 395, 405 [and] n.8, 518 A.2d 35 (1986). In order to prove a *Brady* violation, the defendant must show: (1) that the prosecution suppressed evidence after a request by the defense; (2) that the evidence was favorable to the defense; and (3) that the evidence was material." (Internal quotation marks omitted.) *State* v. *Ouellette*, 295 Conn. 173, 185, 989 A.2d 1048 (2010).

"The state's failure to disclose an agreement with a cooperating witness may be deemed to be the withholding of exculpatory evidence. Impeachment evidence falls within *Brady*'s definition of evidence favorable to

an accused. . . . Impeachment evidence is broadly defined in this context as evidence that could potentially alter the jury's assessment of a witness' credibility. . . . Specifically, we have noted that [a] plea agreement between the state and a key witness is impeachment evidence falling within the . . . *Brady* doctrine." (Citations omitted; internal quotation marks omitted.) *Marquez* v. *Commissioner of Correction*, 330 Conn. 575, 592, 198 A.3d 562 (2019).

"The [United States] Supreme Court established a framework for the application of *Brady* to witness plea agreements in *Napue* v. *Illinois*, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959), and *Giglio* v. *United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972). . . . Drawing from these cases, this court has stated: [D]ue process is . . . offended if the state, although not soliciting false evidence, allows it to go uncorrected when it appears. . . . If a government witness falsely denies having struck a bargain with the state, or substantially mischaracterizes the nature of the inducement, the state is obliged to correct the misconception. . . . Regardless of the lack of intent to lie on the part of the witness, *Giglio* and *Napue* require that the prosecutor apprise the court when he knows that his witness is giving testimony that is substantially misleading." (Internal quotation marks omitted.) *Diaz* v. *Commissioner of Correction*, 174 Conn. App. 776, 795–96, 166 A.3d 815, cert. denied, 327 Conn. 957, 172 A.3d 204 (2017).

"The prerequisite of any claim under the *Brady*, *Napue* and *Giglio* line of cases is the existence of an undisclosed agreement or understanding between the cooperating witness and the state. . . . Normally, this is a fact based claim to be determined by the trial court, subject only to review for clear error." (Citations omitted.) *State* v. *Ouellette*, supra, 295 Conn. 186–87. "[T]he burden is on the defendant to prove the existence of

undisclosed exculpatory evidence." *State* v. *Floyd*, 253 Conn. 700, 737, 756 A.2d 799 (2000).

"[W]here the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Citations omitted; internal quotation marks omitted.) Id., 737–38. "[T]his court does not retry the case or evaluate the credibility of the witnesses. . . . Rather, we must defer to the [habeas] [court's] assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude. . . . The habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony." (Internal quotation marks omitted.) *Brown* v. *Commissioner of Correction*, 179 Conn. App. 358, 366–67, 179 A.3d 794, cert. denied, 328 Conn. 919, 181 A.3d 91 (2018).

In order to prevail on his claim, the petitioner must first prove "the existence of an undisclosed agreement or understanding between the cooperating witness and the state." *State* v. *Ouellette*, supra, 295 Conn. 186. In support of his claim that there was such an agreement or understanding between the state and Gomez, the petitioner relies principally on our Supreme Court's decision in *Gomez* v. *Commissioner of Correction*, 336 Conn. 168, 243 A.3d 1163 (2020),[4] which he argues

---

[4] We note that the petitioner in *Gomez* v. *Commissioner of Correction*, supra, 336 Conn. 168, is Jamie R. Gomez, not Samuel Gomez, the witness discussed in this opinion. We refer to the petitioner in *Gomez* as the defendant to avoid confusion with the petitioner in this appeal.

stands for the broad proposition that when there is "critical testimony provided by a witness," plus "conspicuous leniency delivered to a witness," there is "only one reasonable conclusion": that an agreement exists between the witness and the state. (Internal quotation marks omitted.) On the basis of that proposition, the petitioner further argues that the habeas court's finding in this case that there was no agreement or understanding between the state and Gomez was clearly erroneous because of the timeline of events that occurred prior to, during, and following Gomez' testimony at the petitioner's criminal trial. Specifically, he notes that "the state and Gomez had been in talks as early as his May 23, 2011, arraignment in part B court" and that, consistent with those discussions, "the state arranged to have Gomez' case transferred to part A court 'because of the issues with wanting statements from Gomez' regarding the murder." The petitioner further observes that there was no action in Gomez' case for nineteen months, that Gomez incriminated himself during his testimony at the petitioner's criminal trial, and that only nine days after Moore was sentenced, Gomez pleaded guilty to reduced charges.

On the basis of these events, the petitioner contends that our Supreme Court's decision in *Gomez* required the habeas court in this case to find that there was an agreement or understanding between the state and Gomez because, "[b]ut for the state giving [Gomez] some reason to feel assured he could [testify] without risk of significant punishment, there is no plausible explanation for Gomez openly admitting to being an accessory to murder *and* explicitly admitting his guilt to the two charges pending against him at that time." (Emphasis in original.)

Because the petitioner's claim relies principally on his contention that our Supreme Court's decision in

*Gomez* required the habeas court in this case to conclude that Gomez testified falsely at the petitioner's criminal trial about whether he had reached an agreement or understanding with the state about his testimony at the petitioner's criminal trial, we begin with an examination of that decision. In *Gomez*, the defendant had been convicted of murder and conspiracy to commit murder. See *Gomez* v. *Commissioner of Correction*, supra, 336 Conn. 172. The state's key witnesses at trial were two other alleged coconspirators, Angeline Valentin and James "Tiny" Smith. Id., 171. After his convictions were affirmed on direct appeal; see *State* v. *Booth*, 250 Conn. 611, 737 A.2d 404 (1999), cert. denied sub nom. *Brown* v. *Connecticut*, 529 U.S. 1060, 120 S. Ct. 1568, 146 L. Ed. 2d 471 (2000); the defendant filed a second petition for a writ of habeas corpus challenging his conviction on the ground that his prior habeas counsel provided ineffective assistance because he failed to raise the claim that the state had violated his right to due process when the prosecutor failed to correct the allegedly false testimony of Valentin and Smith at trial concerning whether (1) the state had agreed to support a more favorable disposition of their criminal cases in exchange for their testimony at Gomez' criminal trial and (2) they received any benefit at their respective sentencing hearings in exchange for agreeing to provide such testimony. See *Gomez* v. *Commissioner of Correction*, supra, 173.

"The habeas court, *Oliver, J.*, denied the petition. With respect to the [defendant's] due process claim, the court found that [t]he [defendant] . . . failed to demonstrate that the underlying trial testimony of Smith and Valentin was 'false' . . . as opposed to, for example, [a reflection of] their uncertainty as to the likely posttrial sentencing scenario. The court also found that [t]he nature and circumstances of [Smith's] and Valentin's 'agreements' were thoroughly explored and dissected on both direct and cross-examination. There is

no reasonable probability that the jury was misled in this regard . . . . [The court also] found that at least one other defense attorney in the consolidated trial was . . . aware of the agreement by which the prosecuting authority would bring the cooperation of Smith and Valentin to the attention of the sentencing judge posttrial and, therefore, concluded that the [defendant] had failed to demonstrate that [his attorney] was unaware of the existence of that agreement. For these reasons, the court concluded that there had been no due process violation and, therefore, that prior counsel had not performed deficiently in failing to raise the claim.

"The habeas court subsequently granted the [defendant's] petition for certification to appeal, and [this court] affirmed the judgment. *Gomez* v. *Commissioner of Correction*, [178 Conn. App. 519, 522, 176 A.3d 559 (2017), rev'd, 336 Conn. 168, 243 A.3d 1163 (2020)]. [In doing so, this court] concluded that, in light of the clear and undisputed evidence of the agreements, the habeas court's finding that the state had limited agreements to bring the cooperation of Valentin and Smith to the attention of the trial court posttrial . . . was not clearly erroneous. . . . [This court] also concluded, however, that there had been no violation of the [defendant's] due process rights, as elucidated in *Napue* . . . and *Giglio* . . . because the agreements had been disclosed to defense counsel." (Citation omitted; internal quotation marks omitted.) *Gomez* v. *Commissioner of Correction*, supra, 336 Conn. 173–74.

The defendant appealed to our Supreme Court, which granted certification. On appeal, the defendant contended "that both Smith and Valentin provided material, false or misleading testimony and that the fact that defense counsel had actual or constructive notice thereof did not satisfy the duty of the prosecutor, under *Napue* and *Giglio*, to correct the witnesses' false testimony." Id., 175. Specifically, the defendant contended

"that both witnesses falsely testified at trial that (1) the state had not promised them anything in return for their cooperation, and (2) they did not receive any benefit at their respective bond hearings in exchange for cooperating." Id., 176.

With respect to the first contention, the respondent conceded that both witnesses provided materially false testimony in this regard. With respect to the second contention, our Supreme Court held that the habeas court's finding that Valentin truthfully testified that she had received no benefit in exchange for her cooperation was clearly erroneous. In so holding, the court first recited the following exchange between Valentin and Attorney Jeremiah Donovan, who represented the codefendant Daniel Brown at the defendant's consolidated criminal trial:

"[Donovan]: After you testified against . . . [Anthony Booth, a codefendant], you were released from jail, weren't you?

"[Valentin]: Yes, I was.

"[Donovan]: Do you think there might be, there just might be, some connection between [your] testifying against . . . Booth and your not being in jail anymore?

"[Valentin]: No.

"[Donovan]: You don't see any connection at all?

"[Valentin]: (Witness nods in the negative.)" Id., 177.

According to the Supreme Court, however, the transcript from Valentin's bond hearing "flatly belie[d] her testimony that there was no connection between her cooperation and the fact that she made bail. The hearing began with [the prosecutor] informing the court of the scope and importance of Valentin's cooperation: 'We have multiple, sworn statements from her, Your Honor, and she did testify at length and, we believe, truthfully

at the probable cause hearing for . . . Booth, and was instrumental in a finding of probable cause for . . . Booth.' In his argument to the court at the bond hearing, Valentin's attorney, Bernard W. Steadman, then repeatedly emphasized the significance and extent of his client's cooperation. Finally, in making his bond recommendation to the court, [the prosecutor] stated: 'I did indicate to . . . Steadman, Your Honor, that I would bring to the court's attention her cooperation, and I think I've done that. . . . I also think she should be aware that, if she [is permitted to move to New Jersey and does not remain available], and if the state has to go and seek her out . . . she will have forfeited whatever benefits she has gained from her cooperation to this point. . . . [S]o . . . she would be in serious trouble should she not cooperate and be available. Having said that, Your Honor, I'm not sure whether a promise to appear is the appropriate thing, but I think certainly a substantial reduction in her bond is appropriate. . . . I think . . . if I were in your position, I would be considering a written promise to appear. . . . I would not be averse to a written promise to appear.'

"Consistent with the state's suggestion, the court ultimately reduced Valentin's bond from $100,000 to a written promise to appear and allowed her to move from Connecticut to New Jersey, despite the pending charge of accessory to assault in the first degree. In explaining that decision, the court stated: '[C]onsidering all of the factors . . . [and] the information relayed by counsel, particularly taking into consideration the youth and cooperative aspects of this matter, I'm going to . . . reduce the bond . . . .' " (Footnote omitted.) Id., 177–78. On the basis of its review of the transcript from Valentin's bond hearing, the court in *Gomez* ultimately concluded that, "[i]n light of the multiple references to Valentin's cooperation in the course of what was a relatively brief hearing, including [the prosecutor's]

statement implying that Valentin had gained benefits from her cooperation, we do not think any reasonable conclusion may be drawn other than that her trial testimony that there was no possible connection between her cooperation and her release from jail was false." Id., 178.

As the foregoing review of our Supreme Court's decision in *Gomez* clearly demonstrates, and contrary to the petitioner's argument in this case, our Supreme Court in *Gomez* did not conclude that a habeas court must, in all cases, infer the existence of an agreement or understanding any time there is "critical testimony" from a witness at a criminal trial that is followed by "conspicuous leniency" delivered to that witness in connection with his or her own criminal case. Rather, the court in *Gomez* simply concluded that the habeas court's finding that Valentin had testified truthfully at the defendant's criminal trial was clearly erroneous based on the undisputed record from Valentin's bond hearing. The transcripts from Valentin's bond hearing included multiple references to her cooperation in the course of a relatively brief hearing as well as the prosecutor's statements strongly implying that Valentin had, in fact, received benefits by way of a reduction in her bond in exchange for her prior cooperation at a codefendant's probable cause hearing.

Having rejected the petitioner's broad characterization of our Supreme Court's decision in *Gomez*, we now turn to the record in this case to determine whether the habeas court's finding that Gomez testified truthfully during the petitioner's criminal trial was clearly erroneous. At the habeas trial, the respondent introduced testimony from Gomez, his former attorney, and three prosecutors, all of whom testified that there was no formal or informal agreement or understanding between Gomez and the state. Gomez testified that he was never approached by Smith, Carney, or Catania about a plea

agreement. He stated that the testimony that he provided at the petitioner's criminal trial was the complete truth, including his testimony that he had not received any offers from the state in exchange for his testimony. Additionally, he denied that he himself had approached the state to offer to testify in exchange for consideration in his own case but asserted that he hoped that he would benefit from his testimony.[5]

Catania, who represented Gomez in his criminal case, testified that, although there was a hope that Gomez would receive some sort of leniency from the state due to his cooperation at the petitioner's criminal trial, there had been no discussions with the state about an agreement prior to Gomez' testimony.[6]

[5] The following exchange took place during the cross-examination of Gomez by the respondent's counsel:

"[The Respondent's Counsel]: You did not approach the state of Connecticut, the prosecutor or the police and offer to testify against [the petitioner] in exchange for consideration on your own case, did you?

"[Gomez]: No.

"[The Respondent's Counsel]: And, in fact, at the time you testified, you testified that by testifying you certainly were hoping it might benefit you but that no promises had been made to you; is that correct, sir?

"[Gomez]: Yes.

"[The Respondent's Counsel]: And is it fair to say that no—you never spoke to a prosecutor who offered you consideration in exchange for your testimony, right?

"[Gomez]: Yeah."

[6] The following exchange took place during the direct examination of Catania by the petitioner's counsel:

"[The Petitioner's Counsel]: Do you recall [Gomez] stating he hoped for the best for a deal by the state?

"[Catania]: I'm sure he said something to that effect. I don't remember what he said exactly.

"[The Petitioner's Counsel]: Okay. And do you recall [Gomez] stating yes, that he'd hoped his testimony would help his sentencing out?

"[Catania]: I don't recall him saying that, but I think the record does reflect that.

"[The Petitioner's Counsel]: Okay. And despite [Gomez] saying all of that on record, do you still maintain that no kind of lenient agreement of— or really any informal agreement had been brokered between the state and [Gomez]?

"[Catania]: There was certainly a hope that [Gomez'] testimony would

Carney, the original prosecutor in Gomez' criminal case, also confirmed that no plea offer had been made between the state and Gomez before the petitioner's criminal trial.[7] Additionally, when asked about the recommended sentence Gomez was to receive, he stated that he recommended it because it took into consideration the fact that Gomez had testified against the petitioner but that he did not consider this sentence during the petitioner's criminal trial.[8] Carney further testified

put him in a better light and better favor to—to the court regarding his own case but there [were] no specific agreements. There was no—nothing set—set down. That was what our—our hope was in his cooperation but there was nothing promised from the state."

[7] The following exchange took place during the direct examination of Carney by the petitioner's counsel:

"[The Petitioner's Counsel]: Do you recall if any plea offer had been arranged between the state and [Gomez]?

"[Carney]: Well, at some point there was a plea offer. Yes.

"[The Petitioner's Counsel]: Was one provided before trial?

"[Carney]: Before [the petitioner's] trial?

"[The Petitioner's Counsel]: Correct.

"[Carney]: No. One was not.

                                 \* \* \*

"[The Petitioner's Counsel]: On this day—this was June 24, 2011—was there any arrangement at that time between yourself and [Catania] on behalf of [Gomez] regarding any kind of an informal agreement, a plea arrangement or anything to that effect?

"[Carney]: If this was before the [petitioner's] trial, there would not [have] been any agreement.

"[The Petitioner's Counsel]: Okay. At any time did you personally solicit from [Gomez] favorable testimony?

"[Carney]: No."

[8] The following exchange took place during the direct examination of Carney by the petitioner's counsel:

"[The Petitioner's Counsel]: [W]hat was considered to make that recommendation [for Gomez' sentence]?

"[Carney]: When I was making that recommendation, I took into consideration the fact that [Gomez] had testified against the petitioner.

"[The Petitioner's Counsel]: And you had decided that when, to your recollection?

"[Carney]: This sort of looks like the recommendation was made on that day but sometime after I spoke to [Smith] about the fact that [Gomez] had testified against the petitioner. . . .

"[The Petitioner's Counsel]: Is it possible that this was considered during

that he is aware of his duty to disclose exculpatory evidence and any plea bargain agreements that might be made with cooperating witnesses, and that he would not make any sort of deal or agreement without disclosing it to opposing counsel.

Smith, the prosecutor in the petitioner's criminal trial, testified that he was not aware of any plea arrangement or informal agreement made by the state with Gomez in exchange for his testimony and that he did not personally solicit Gomez to provide favorable testimony against the petitioner. Additionally, Smith testified that, despite Gomez' statement that he hoped his testimony would help him during sentencing, Smith did not make any promises or informal agreements with Gomez.[9] Smith further testified that he is aware of his ethical obligation to disclose any plea agreements of any cooperating witnesses and that he follows that ethical obligation.

Finally, Narducci, the prosecutor in Gomez' case at the time Gomez entered his guilty plea, testified that

[the petitioner's] trial?

"[Carney]: It definitely would not have been. . . .

"[The Petitioner's Counsel]: In general, was there any communication among prosecutors about a plea agreement in your office before or during [the petitioner's] trial?

"[Carney]: There would not have been."

[9] The following exchange took place during the direct examination of Smith by the petitioner's counsel:

"[The Petitioner's Counsel]: Do you recall [Gomez] stating quote, yes, that he hoped his testimony would help his sentencing?

"[Smith]: I—I do recall that. Yes.

"[The Petitioner's Counsel]: And despite him stating that, do you still maintain there was no plea arrangement or any kind of informal agreement had between you and [Gomez] before he testified on the stand?

"[Smith]: I made no promises, no informal agreement, nothing. . . .

"[The Petitioner's Counsel]: And all that you had discussed with [Carney] before [Gomez' guilty] plea was that you just found [Gomez'] testimony to be credible and helpful in your case?

"[Smith]: I believe that was it. I—I believe I said I thought he was credible, truthful, and it was helpful in [the] case. Yes."

he had no knowledge of any plea offer from the state to Gomez. He further testified that he did not personally solicit favorable testimony from Gomez in preparation for Gomez' sentencing hearing. Finally, Narducci testified that he had no recollection of having any discussions about Gomez with Smith.

Notwithstanding all of this testimony and the trial court's finding that each of these witnesses testified credibly, the petitioner argues that the timeline of events surrounding the petitioner's conviction and the subsequent resolution of Gomez' criminal case, as well as certain statements made during Gomez' sentencing following the petitioner's conviction, render the habeas court's findings clearly erroneous on the question of whether Gomez falsely testified at the petitioner's criminal trial that he had reached no agreement or understanding with the state in exchange for his testimony. The petitioner argues that "[b]ut for the state giving [Gomez] some reason to feel assured he could [testify] without risk of significant punishment, there is no plausible explanation for Gomez openly admitting to being an accessory to murder *and* explicitly admitting his guilt to the two charges pending against him at that time." (Emphasis in original.)

We reject the petitioner's assertion that the record in this case requires us to conclude that the habeas court's findings were clearly erroneous. First, as we have already explained, our Supreme Court in *Gomez* did not hold that, whenever there is "critical testimony provided by a witness" plus "conspicuous leniency delivered to a witness," a court must find that an agreement exists between the witness and the state.

Second, and contrary to the petitioner's assertions, the transcripts from Gomez' sentencing hearing that the petitioner submitted as exhibits during his habeas trial do not contradict the testimony of the witnesses

who testified at the petitioner's habeas trial. Although the transcripts from that hearing reveal that the prosecutor informed the court that it was supporting a relatively lenient disposition "in consideration" for the testimony that Gomez had given at the petitioner's criminal trial, he did not state or imply that the state had reached an agreement or understanding with Gomez at the time of the petitioner's criminal trial. Moreover, the habeas court was not required to infer such an agreement or understanding under the circumstances of this case. Indeed, if we were to hold otherwise, no court could *ever* credit a witness' testimony that he or she testified truthfully and voluntarily to their own detriment without also testifying that they had received a promise or assurance from the state *even if no such promise or assurance was ever made.* We are unaware of any authority supporting such a proposition and the petitioner has not brought any such authority to our attention on appeal.[10]

On the basis of our review of the record in this case, including the testimony of all of the witnesses who testified during the habeas trial that the state did not reach a formal or informal agreement or understanding with Gomez with respect to his testimony at the petitioner's criminal trial, we conclude that the habeas court's finding was not clearly erroneous. It therefore did not err when it denied the petitioner's petition for a writ of habeas corpus.

---

[10] This is not to say, of course, that a criminal defendant or habeas petitioner may never rely on circumstantial evidence to argue that there may have been an agreement or understanding between a witness and the state in a particular case. Although a criminal defendant's counsel certainly may, as the petitioner's defense counsel did in this case, cross-examine a witness during a defendant's criminal trial about whether such testimony is truthful or credible and a habeas court certainly may take into consideration such evidence when considering whether a witness' trial testimony to that effect was truthful, such circumstantial evidence does not *require* a habeas court in all circumstances to infer the existence of such an agreement and find testimony to the contrary to be false.

## II

The petitioner also argues that this court should revisit its prior ruling on his motion for review. Specifically, he asks that we grant the relief requested therein to rectify the record in his habeas case with the entire court file and all of the transcripts from Gomez' criminal case, even though those materials were never submitted to the habeas court. In the alternative, he asks us to take judicial notice of those materials. We reject both requests because they constitute an invitation for us to overrule a prior order of this court on an identical issue and to consider evidence that was not before the habeas court for the purpose of engaging in what amounts to fact-finding.

By way of background, on March 7, 2023, the petitioner filed with this court a motion for permission to file a late "motion for rectification and/or augmentation of the record." Specifically, in the motion for rectification and/or augmentation of the record, the petitioner asked the court to rectify or augment the record to include (1) additional transcripts from the prosecution of Gomez and (2) Gomez' court file.[11] The petitioner argued that these additional materials "clearly show that [Gomez] had been in communication with the state prior to his testimony and he had been made to understand that, by testifying against [the petitioner], he would avoid any significant penalty for his role in the murder." The petitioner claimed that he tried to obtain

---

[11] In his motion for rectification and/or augmentation of the record, the petitioner also sought to rectify the record to include certain police reports authored by Detective James Curtis. Additionally, he requested an evidentiary hearing pursuant to *State* v. *Floyd*, supra, 253 Conn. 700, "to augment the record with testimony from [Curtis] concerning [his] discussions with [Gomez] prior to his testimony against [the petitioner]." The petitioner, however, did not seek review of the habeas court's denial of these requests in his motion to this court for review of the habeas court's decision, nor does he request on appeal that this court augment and/or rectify the record with these reports.

these materials during his habeas trial "but was told they either did not exist or could not be located." The petitioner, however, offered no evidence in support of his claim that he had previously requested these materials during his habeas trial or that those requests were denied. The respondent did not object to the petitioner's motion for permission.

On April 19, 2023, this court granted the motion in part and ordered the habeas court to consider the petitioner's motion. The respondent filed an objection to the petitioner's motion for rectification in the habeas court. In his objection, the respondent argued that (1) the petitioner was improperly seeking to create a record, rather than rectify the existing record, because none of the evidence that the petitioner sought to include was ever before the habeas court; (2) the additional materials did not reveal the existence of any undisclosed agreement or understanding between Gomez and the state; and (3) although the petitioner claimed that the materials he was seeking to include in the record constituted "new information obtained after judgment" because he allegedly was unable to obtain the materials in previous attempts prior to his habeas trial, the petitioner provided "no support for this claim," and because the materials "were matters of public record," they could not "be said to have been suppressed for *Brady* purposes." The habeas court denied the petitioner's motion on May 24, 2023, "for the reasons articulated in the respondent's objection." On June 6, 2023, the petitioner filed with this court a motion for review of the habeas court's denial of his motion. On June 22, 2023, the respondent filed an objection to the petitioner's motion for review. On July 25, 2023, this court granted the motion for review but denied the relief requested therein.

At his habeas trial, the petitioner moved into evidence various transcripts from his own criminal case, as well

as three transcripts from Gomez' criminal case, which were admitted in full. He now asks this court, however, to consider the entire court file and all of the transcripts from Gomez' criminal case notwithstanding the fact that the habeas court denied his motion for rectification and this court already denied the relief requested in his motion for review of the habeas court's order. The petitioner states that, although "the existing record . . . compels the conclusion . . . that Gomez and the state indeed had an agreement or understanding . . . [t]he additional Gomez transcripts with which the petitioner seeks to rectify or augment the record—or alternatively, of which the petitioner asks this court to take judicial notice—only further demonstrates Gomez' understanding with the state." (Emphasis omitted; internal quotation marks omitted.) Specifically, the petitioner argues that the additional materials would demonstrate that Gomez' case was delayed pending resolution of the petitioner's case and that there appeared to be a consensus among the court and the parties involved with the Gomez case that they would delay taking any actions in Gomez' criminal case pending resolution of the petitioner's case and Gomez' testimony in that case. The petitioner states that "[e]veryone—Gomez, the state, and the court—were in the loop: Gomez' testimony would be rewarded once it put [the petitioner] away. The jury should have been made aware of that, too."

We decline the petitioner's request to overrule this court's previous ruling on his motion for review of the habeas court's denial of his request to rectify/augment the record with these additional materials. The petitioner's arguments on appeal are nearly identical to those he made before this court in his motion for review. Where a party has already sought and obtained review of a motion pursuant to the proper procedure, we typically decline a second review of that claim. See *State*

v. *Casiano*, 122 Conn. App 61, 71, 998 A.2d 792 (The court declined to review a claim where the "defendant already ha[d] sought and obtained review via the proper procedure of a motion for review. He cannot obtain further review of his claim on appeal. . . . To review the defendant's claim would be providing two appellate reviews of the same issue." (Citation omitted; internal quotation marks omitted.)), cert. denied, 298 Conn. 931, 5 A.3d 491 (2010); *Burke* v. *Burke*, 94 Conn. App. 416, 420–21, 892 A.2d 964 (2006) (court declined to revisit claim where party had already obtained review via motion for review).

The petitioner cites to a number of cases in support of his request that this court overrule its decision denying the relief he sought in his prior motion for review. The petitioner claims, for instance, that in *State* v. *Floyd*, supra, 253 Conn. 700, our Supreme Court "established a policy in favor of the 'rapid resolution' of *Brady* claims through rectification where a defendant discovers the nondisclosure after trial." In addition, he argues in his reply brief that "[a]n appellate court may, upon the motion of a party . . . revisit a motion for review that it has denied when *both* the underlying appeal and the motion for review are properly before that court"; (emphasis in original; internal quotation marks omitted); pointing this court to *McClintock* v. *Rivard*, 219 Conn. 417, 425, 593 A.2d 1375 (1991); *PMG Land Associates, L.P.* v. *Harbour Landing Condominium Assn., Inc.*, 135 Conn. App. 710, 715 n.5, 42 A.3d 508 (2012); *Housing Authority* v. *Charter Oak Terrace/ Rice Heights Health Center, Inc.*, 82 Conn. App. 18, 23, 842 A.2d 601 (2004); and *Biller Associates* v. *Rte. 156 Realty Co.*, 52 Conn. App. 18, 25, 725 A.2d 398 (1999), aff'd, 252 Conn. 400, 746 A.2d 785 (2000).

None of these cases stand for the proposition that this court should overrule itself on the question of

whether the habeas court should have rectified/augmented the record in this case with materials that were not before it at the time of trial. In *Floyd*, the defendant had obtained newly discovered evidence while his direct appeal was pending regarding a key witness who had testified against him during his criminal trial. See *State* v. *Floyd*, supra, 253 Conn. 730. Our Supreme Court granted the defendant's motion for review, exercised its supervisory authority, and ordered the trial court to hold an evidentiary hearing on that newly discovered evidence. Id., 732. In doing so, the court noted: "After the defendant was convicted, the defendant's appellate counsel obtained information concerning the disposition of the drug charges against [a witness], which, the defendant claims, showed that [the witness] had, in fact, received favorable treatment from the state in the criminal proceedings against him as of the date of his testimony in this case. Specifically, appellate counsel learned that the state had not prosecuted [the witness] for a violation of his probation in connection with his June 21, 1994 arrest, and that the state had not opposed the reduction of [the witness'] $50,000 bond to a promise to appear. Appellate counsel also obtained evidence that, according to the defendant, shows that [the witness] received favorable treatment from the state after his testimony in this case. Specifically, appellate counsel learned that, at the February 2, 1996 sentencing hearing in [the witness'] drug case, which occurred approximately two months after [the witness'] trial testimony in this case, the state indicated that it was filing a substitute information charging [the witness] with only one count of possession with intent to sell narcotics. [The witness] pleaded guilty to that charge, and the state recommended a five year prison sentence, execution suspended, and three years probation with special conditions. The trial court imposed the recommended sentence." (Footnote omitted.) Id., 730–31.

Unlike the petitioner in *Floyd*, the petitioner in this case is not asking us to consider evidence that he discovered for the first time during the pendency of his direct appeal. Instead, he asks us to grant the very relief that both the habeas court and this court previously denied pursuant to the appropriate procedures for obtaining such relief. Moreover, even assuming arguendo that *Floyd* applies in habeas proceedings, a question that neither this court nor our Supreme Court has squarely resolved, this court has made clear that it will order a *Floyd* hearing "only in the unusual situation in which a defendant was precluded from perfecting the record due to new information obtained after judgment." (Internal quotation marks omitted.) *State* v. *Ortiz*, 280 Conn. 686, 713 n.17, 911 A.2d 1055 (2006). Thus, we have rejected requests for *Floyd* hearings where a petitioner, like the petitioner in this case, failed to demonstrate that he or she was precluded from perfecting the record due to new information obtained after judgment. See *Diaz* v. *Commissioner of Correction*, 152 Conn. App. 669, 681, 100 A.3d 856 (petitioner could not use motion for rectification/augmentation to request "*Floyd* type" hearing as method of introducing new evidence to habeas court concerning witness at his criminal trial where petitioner knew about evidence at time of habeas hearing), cert. denied, 314 Conn. 937, 102 A.3d 1114 (2014); *State* v. *Hamlin*, 90 Conn. App. 445, 453, 878 A.2d 374 (declining defendant's request to remand for *Floyd* hearing when record demonstrated that "defendant was aware, prior to both the suppression hearing and trial, that the holding cell conversation had occurred"), cert. denied, 276 Conn. 914, 888 A.2d 86 (2005).

The other cases upon which the petitioner relies are no more availing, as they involved requests for *articulation* and merely held that "a second review [of a denial of a request for articulation] is not required except

when plenary review of the case on the merits of the appeal discloses that our earlier decision was ill considered, and that *further articulation is necessary* for the just determination of the appeal." (Emphasis added; internal quotation marks omitted.) *McClintock* v. *Rivard,* supra, 219 Conn. 425. In this case, the petitioner is not asking us to order an articulation that was previously denied by another panel of this court that did not hear the merits of the underlying appeal. Instead, by seeking to have us revisit our prior ruling on his motion for review of the habeas court's denial of his request to rectify or augment the record with additional transcripts and a court file that existed at the time of his habeas trial, the petitioner would have this court engage in what amounts to impermissible fact-finding. It is well settled that "[a]s a reviewing court, [w]e cannot act as a [fact finder] or draw conclusions of facts from the primary facts found, but can only review such findings to determine whether they could legally, logically and reasonably be found, thereby establishing that the trial court could reasonably conclude as it did." (Internal quotation marks omitted.) *Osborn* v. *Waterbury,* 197 Conn. App. 476, 482, 232 A.3d 134 (2020), cert. denied, 336 Conn. 903, 242 A.3d 1010 (2021). Moreover, were we to grant the petitioner's request and consider evidence that was not reviewed by the habeas court or by the state, even though the petitioner had the opportunity to present such evidence, the result would be trial by ambuscade. See *Michael T.* v. *Commissioner of Correction,* 319 Conn. 623, 636 n.7, 126 A.3d 558 (2015) ("[a] party is ambushed when that party is deprived of a fair chance to defend a claim at the trial level and create a record for appeal" (internal quotation marks omitted)); *Ochoa* v. *Behling,* 221 Conn. App. 45, 50–51, 299 A.3d 1275 (2023) ("to permit a party to raise a claim on appeal that has not been raised at trial— after it is too late for the trial court . . . to address

the claim—would encourage trial by ambuscade, which is unfair to both the trial court and the opposing party" (internal quotation marks omitted)); *State* v. *Hamlin*, supra, 90 Conn. App. 453 (The court denied the defendant's request to remand the case for a *Floyd* hearing because "[o]ur rules of procedure do not allow a defendant to pursue one course of action at trial and later, on appeal, argue that a path he rejected should now be open to him. . . . To rule otherwise would permit trial by ambuscade." (Internal quotation marks omitted.)).

The petitioner also argues that this court "can and should . . . take judicial notice of the additional Gomez transcript[s] and the statements recorded therein that evidence the existence of an agreement or understanding between Gomez and the state." In support of this argument, the petitioner points to *Ajadi* v. *Commissioner of Correction*, 280 Conn. 514, 911 A.2d 712 (2006), a case in which he claims the Supreme Court "took judicial notice of Superior Court transcripts and allowed them to serve as the factual predicate for a claim on appeal." Although the petitioner is correct that the court in that case took judicial notice of Superior Court transcripts, it did so in the absence of any objection from the respondent and not for the purpose of inferring facts from evidence that was not before the habeas court to determine whether the court's findings were clearly erroneous. In *Ajadi*, the petitioner learned during the pendency of the appeal that the habeas judge had previously represented him as an attorney with respect to one of the criminal convictions underlying his petition for a writ of habeas corpus. See *Ajadi* v. *Commissioner of Correction*, supra, 522–23. The petitioner claimed on appeal that the habeas judge improperly failed to disqualify himself. Id., 523. In support of that claim, the petitioner requested, and the Supreme Court ultimately agreed, to take judicial notice of transcripts of his arraignment proceeding that conclusively

established that the habeas judge previously had represented him. Id., 522 n.13.

The petitioner also cites to *State* v. *Gaines*, 257 Conn. 695, 778 A.2d 919 (2001), for the proposition that a court may "take judicial notice of transcripts from a separate case and [allow a party] to use the judicially noticed transcript as the basis for the factual premise of the [party's] argument on appeal . . . ." Id., 712 n.12. In *Gaines*, however, the court granted the state's motion to take judicial notice of transcripts from a prior case but, in granting the request, specifically stated that "this court is not a fact-finding tribunal. Thus, although we can take judicial notice of [the] request, we cannot infer [particular facts therefrom]." Id.

In this case, the petitioner asks us to do precisely what the court in *Gaines* said we cannot do: take judicial notice of materials for the purpose of weighing evidence and inferring facts. We therefore decline the petitioner's invitation to take judicial notice of the transcripts and court file from Gomez' criminal case.

The judgment is affirmed.

In this opinion the other judges concurred.