******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.*
ALEXANDER A. GARRISON
(AC 43796)

Moll, Suarez, and Prescott, Js.

*Syllabus*

Convicted of assault in the first degree, the defendant appealed. He claimed, inter alia, that the trial court improperly denied his motion to suppress certain statements he made to police officers while he was in a hospital receiving treatment for injuries he sustained in a physical altercation that led to his arrest and conviction. This court reversed the judgment of conviction and remanded the case for a new trial without addressing the other claims the defendant raised in his appeal. On the granting of certification, the state appealed to our Supreme Court, which determined that the defendant had not been in custody during any of his interactions with the police at the hospital and, therefore, his statements should not have been suppressed. The Supreme Court reversed the judgment of this court and remanded the case to this court with direction to consider the defendant's remaining claims on appeal, including his claim that the admission of his statements to the police violated his right to due process. *Held*:

The trial court did not improperly deny the defendant's motion to suppress his statements to the police officers, as the state sufficiently demonstrated that the statements, under the totality of the circumstances, were voluntary and, thus, their admission at trial did not violate his right to due process.

The trial court did not abuse its discretion in denying the defendant's motion for sanctions against the state for its failure to comply with certain of the court's discovery orders and its failure to disclose alleged impeachment evidence pursuant to *Brady* v. *Maryland* (373 U.S. 83) and *Giglio* v. *United States* (405 U.S. 150).

This court declined the defendant's request to exercise its supervisory authority over the administration of justice to direct trial courts to conduct a formal, on the record inquiry during pretrial hearings to ascertain whether the state has exercised due diligence in locating evidence favorable to defendants, as the defendant failed to demonstrate that this case presented the rare circumstance in which traditional constitutional, statutory and procedural limitations were inadequate to protect the rights of the defendant and the integrity of the judicial system.

Submitted on briefs October 7, 2024—officially released February 25, 2025

*Procedural History*

Information charging the defendant with the crimes of assault in the first degree and tampering with physical

evidence, brought to the Superior Court in the judicial district of Tolland, where the court, *Bhatt, J.*, denied the defendant's motion to suppress certain evidence; thereafter, the case was tried to the court, *Seeley, J.*; subsequently, the court, *Seeley, J.*, granted the defendant's motion for a judgment of acquittal as to the charge of tampering with physical evidence; judgment of guilty of assault in the first degree, from which the defendant appealed to this court, *Prescott, Suarez* and *Bishop, Js.*, which reversed the trial court's judgment and remanded the case for a new trial, from which the state, on the granting of certification, appealed to the Supreme Court, which reversed this court's judgment and remanded the case to this court for further proceedings. *Affirmed.*

*Erica A. Barber* filed a brief for the appellant (defendant).

*Matthew C. Gedansky*, state's attorney, and *Sarah Hanna*, former senior assistant state's attorney, and *Jaclyn Preville*, supervisory assistant state's attorney, filed a brief for the appellee (state).

*Opinion*

PRESCOTT, J. This case returns to us on remand from our Supreme Court. In *State* v. *Garrison*, 213 Conn. App. 786, 278 A.3d 1085 (2022), rev'd, 350 Conn. 61, 323 A.3d 279 (2024), the defendant, Alexander A. Garrison, appealed from the judgment of conviction, rendered after a bench trial, of assault in the first degree in violation of General Statutes § 53a-59 (a) (1). On appeal, the defendant claimed, inter alia, that the trial court improperly denied his motion to suppress statements he made to police officers while at a hospital because those statements were the result of a custodial interrogation and he had not been advised of his rights pursuant to *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). *State* v. *Garrison*,

supra, 789–90. We agreed with the defendant and further concluded that he was harmed by the admission of these statements. Id., 790. Accordingly, we reversed the judgment of conviction and remanded the case for a new trial without addressing the other claims raised by the defendant in his appeal. See id., 790 n.1.

After granting the state's petition for certification to appeal, our Supreme Court reversed the judgment of this court. *State* v. *Garrison*, 350 Conn. 61, 63, 323 A.3d 279 (2024). Specifically, it determined that the defendant was not in custody during any of his interactions with the police at the hospital, and, therefore, his statements made at that time should not have been suppressed. Id. Our Supreme Court then ordered us to consider on remand the defendant's remaining appellate claims.

The remaining issues on appeal are whether the trial court improperly denied (1) the defendant's motion to suppress because, contrary to the determination of the court, his statements to the police were not voluntary, and therefore their admission at trial violated his right to due process, and (2) his motion for sanctions in which he claimed that the state had failed to comply with the court's discovery orders and its constitutional obligation to disclose impeachment evidence pursuant to *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). We are not persuaded by these claims and therefore affirm the judgment of conviction.[1]

The following facts, as recited by our Supreme Court, and procedural history are relevant to the defendant's

---

[1] In his principal appellate brief to this court, the defendant also claimed that the trial court improperly denied his motion to suppress because the police officers "did not electronically record the full custodial interrogation as required pursuant to General Statutes § 54-1o." The defendant, however, explicitly abandoned this claim in his reply brief and, thus, we need not address it.

remaining claims on appeal. "In June, 2018, the defendant visited his close friend, Timothy Murphy, and Murphy's cousin, William Patten, who lived together in an apartment located in Vernon. While drinking beer and whiskey, Murphy, Patten, and the defendant watched television, talked, and played their guitars in the living room of the apartment. Eventually, they moved the gathering outside in order to build a fire in a fire pit on the lawn outside of the apartment. As the evening went on, all three continued drinking beer and whiskey. After several hours of drinking around the fire, Patten and the defendant began arguing over the merits of football and mixed martial arts. The argument led to a physical altercation during which Patten and the defendant pushed one another and fell to the ground. Upon gaining an advantage over the defendant, Patten punched the defendant in the face, injuring his nose and ending the initial fight. Patten and the defendant got off the ground and returned to sitting around the fire. After a few minutes, the defendant, who was angry that Patten had punched him, attacked Patten from behind. The defendant stabbed Patten in his back, front shoulder area, and arm with a Smith & Wesson folding knife that he had been carrying in his waistband. Patten, who did not realize that he was being stabbed, pulled the defendant over his shoulder and kicked him away, which ended the second altercation.

"Patten then returned to the apartment and, realizing that he needed medical attention, walked to the nearby Rockville General Hospital (hospital). In order to obtain treatment for his injured nose, the defendant also walked to the hospital. The defendant arrived at the hospital at approximately 9:42 p.m. and was wheeled into an examining room, where a nurse evaluated him and provided medical care. Consistent with hospital policy, the defendant changed into a hospital gown, and hospital staff placed his clothes into bags. After

performing basic assessments of the defendant's condition, the nurse 'determined that he was alert, awake, and oriented.' Although tests confirmed that the defendant's blood alcohol content measured 0.217, he was able to communicate effectively with the nurse and to respond appropriately to her questions, and he was calm and cooperative. The attending physician who was on duty briefly interacted with the defendant and left a note for the incoming attending physician that the defendant could be discharged once he was clinically sober.

"During the time that the defendant was at the hospital, he was questioned by and made statements to five different Vernon police officers. . . . Those police officers collectively questioned the defendant for approximately one hour; they were not all present at once with the defendant.

"The first interaction . . . was with [Detective Charles] Hicking. When Hicking entered the defendant's room, a nurse was present. Hicking asked the nurse for permission to speak with the defendant, and the nurse assented. The defendant then told Hicking his version of what had occurred that evening, and Hicking asked clarifying questions. The defendant told Hicking that he had stabbed the victim but that it was in self-defense. The interaction ended when nursing staff interrupted Hicking in order to perform their duties. Later, Hicking reentered the defendant's hospital room with another detective, but he did not interact with the defendant. Hicking was dressed in plain clothes, and his weapon was not visible to the defendant.

"The defendant's longest interaction was with [Thomas] Bugbee, a patrol officer, who first entered the defendant's hospital room at 10:13 p.m. During the approximately thirty minute interaction, Bugbee took the defendant's sworn statement. Specifically, the defendant told Bugbee, 'I don't flight, I fight,' 'I'm a peaceable person

until you get in my face, then I'll fuck you up,' and 'I take shit from no one.' While the defendant gave his statement, medical personnel entered and exited the hospital room freely and tended to the defendant. At one point, medical personnel asked Bugbee if they could treat the defendant during the interview; at that time, Bugbee confirmed the defendant's desire to continue the interview in the presence of the staff. As the defendant continued to speak with Bugbee, a nurse inserted an intravenous (IV) catheter into the back of the defendant's hand in order to draw blood. The defendant's IV was not attached to any machine or equipment while he spoke with Bugbee. After putting the defendant under oath and having him sign the statement, Bugbee left the room. At approximately 12:09 a.m., Bugbee reentered the defendant's room to speak with him again. During this brief conversation, Bugbee told the defendant that he was free to go, as far as the police were concerned, but that it was up to the hospital when he could actually leave. At 12:26 a.m., Bugbee repeated to the defendant that the police officers were done speaking with him and that he could leave as soon as the hospital released him. During all of these conversations, Bugbee was in uniform with his weapon visible and his badge displayed.

"After briefly reviewing the statement that the defendant had given to Bugbee, [David] Hatheway, a detective sergeant, entered the defendant's hospital room along with both Sergeant Christopher Pryputniewicz and Bugbee. Hatheway was wearing civilian clothes, but his badge and weapon were visible to the defendant. Hatheway interviewed the defendant about his version of events, during which the defendant described the stabbing and stated to the officers that he 'take[s] shit from no one.' During the interaction, the defendant gave the officers consent to seize and search his clothing, which the medical staff previously had placed into bags.

After concluding the interview, Hatheway relayed his impressions to his superior officer and left the hospital.

"Finally, the defendant spoke with [Michael] Patrizz, who was the lead detective assigned to the case. Accompanied by Hicking, Patrizz entered the defendant's hospital room shortly after 12:30 a.m. and asked the defendant to again provide his version of the events. At that time, Patrizz was dressed in plain clothes with his weapon and badge visible to the defendant. The defendant told Patrizz that he had stabbed the victim in his stomach area and upper chest area but that it was in self-defense. After approximately five to ten minutes, the defendant expressed annoyance at having to repeat his story and indicated a desire to stop speaking. At that point, Patrizz ended the interaction.

"During each interaction with the police officers, the defendant was never physically restrained. No officer asked the medical staff to prolong the defendant's treatment. Although the defendant was intoxicated, he 'was coherent, alert, oriented, and able' to understand his circumstances and to communicate effectively. Apart from his injured nose, medical examinations revealed no other medical concerns. After becoming clinically sober, the defendant was discharged from the hospital at 2:25 a.m. At no point during any of their interactions with the defendant at the hospital did the police advise the defendant of his *Miranda* rights.

"The police arrested the defendant the following day. The state charged the defendant with one count of assault in the first degree in violation of § 53a-59 (a) (1) and one count of tampering with physical evidence in violation of General Statutes § 53a-155." (Footnotes omitted.) *State* v. *Garrison*, supra, 350 Conn. 64–68.

The defendant subsequently moved to suppress the statements that he had made to the officers while he was at the hospital. The defendant asserted that the

motion to suppress must be granted because (1) he was subjected to custodial interrogation by the officers and he had not yet been advised of his *Miranda* rights and (2) regardless of whether he was in custody at the time, his statements were not voluntary.

Over the course of three days, the trial court, *Bhatt, J.*, conducted an evidentiary hearing on the defendant's motion to suppress. Following the conclusion of the hearing, the court issued a memorandum of decision, concluding that the defendant was not in custody when he made the challenged statements and that the challenged statements were voluntary. Accordingly, the court denied his motion to suppress.

The defendant subsequently elected a bench trial and asserted that he had acted in self-defense. The court, *Seeley, J.*, granted the defendant's motion for a judgment of acquittal regarding the charge of tampering with physical evidence, but found the defendant guilty of the assault charge after concluding that the state had disproven self-defense beyond a reasonable doubt. The court sentenced the defendant to ten years of incarceration, execution suspended after seven years, and five years of probation.

The defendant appealed from the judgment of the trial court to this court, claiming, among other things, that the statements he made to the police at the hospital were the result of a custodial interrogation and that, because he had not been advised of his *Miranda* rights before the statements were elicited, he was entitled to have the statements suppressed. See *State* v. *Garrison*, supra, 213 Conn. App. 807. This court unanimously concluded that "a reasonable person in the defendant's position would have believed that he was not at liberty to terminate the police questioning, that his freedom of movement was restricted by the police . . . and that [he] was in police custody to the degree associated

with a formal arrest . . . .” (Citation omitted; internal quotation marks omitted.) Id., 827. This court further concluded that the questioning of the defendant by the police constituted interrogation for purposes of *Miranda* and, therefore, that evidence of the statements should have been suppressed. Id., 808, 827. After concluding that the admission of the statements obtained in violation of *Miranda* was not harmless beyond a reasonable doubt, this court reversed the defendant's judgment of conviction and remanded the case for a new trial. See id., 840–41.

Our Supreme Court granted the state's petition for certification to appeal limited to the following issues: (1) “Did the Appellate Court correctly conclude that the defendant was in custody when he spoke with investigating officers after admitting himself to the hospital?” And (2) “[i]f the answer to the first question is ‘yes,’ did the Appellate Court correctly conclude that the admission of the defendant's statements while in custody was not harmless beyond a reasonable doubt?” *State* v. *Garrison*, 345 Conn. 959, 959, 285 A.3d 52 (2022).

In a split decision, our Supreme Court reversed the judgment of this court, concluding that the trial court properly had determined, under the totality of the circumstances, that the defendant was not in custody during any of his interactions with the law enforcement officers at the hospital.[2] *State* v. *Garrison*, supra, 350 Conn. 85. Our Supreme Court then remanded the case to this court to consider the defendant's remaining

---

[2] In his dissenting opinion, Justice McDonald, joined by Justice Ecker, stated: “Because the Appellate Court's well reasoned opinion fully addresses both of the certified issues in this appeal, it would serve no useful purpose for me to repeat the discussion contained in that opinion. I therefore adopt the Appellate Court's opinion as the proper statement of the issues and the applicable law and reasoning concerning both issues.” *State* v. *Garrison*, supra, 350 Conn. 87 (*McDonald, J.*, dissenting).

issues on appeal. Id. Additional facts and procedural history will be set forth as necessary to resolve these claims.

I

The defendant claims that the court improperly denied his motion to suppress the statements because, contrary to the determination of the court, the defendant's statements to the police were not voluntary and, thus, their admission at trial deprived him of due process under the federal and state constitutions.[3] Specifically, the defendant contends that the state failed to establish that his statements were voluntary under the totality of the circumstances because the record supports a conclusion that he was extremely intoxicated while speaking to the police officers and that they used coercive tactics to overbear his will to such extent that his statements must be deemed involuntary. We are not persuaded.

The trial court made the following findings of fact with respect to this claim. "[T]he totality of circumstances . . . compels the conclusion that the defendant's various statements were voluntary and not the product of an overborne will brought about by coercive police activity. As noted, the video evidence is abundantly clear that the defendant's interactions with the police were nothing but consensual and he was eager to provide his version of events to the police. He repeatedly made spontaneous statements, going into detail,

---

[3] The defendant has not raised a separate claim that the admission of his allegedly involuntary statements was prohibited under our state constitution. Because the defendant has not provided an independent state constitutional analysis asserting greater protection under the state constitution, we analyze his constitutional claim under the assumption that his constitutional right to due process is coextensive under the state and federal constitutions. See *State* v. *Washington*, 345 Conn. 258, 262 n.1, 284 A.3d 280 (2022); *State* v. *Robert S.*, 179 Conn. App. 831, 840 n.11, 181 A.3d 568, cert. denied, 328 Conn. 933, 183 A.3d 1174 (2018).

and had to be asked several times to clarify information and to slow down to enable officers to follow along. He was not restrained in any way and, even though intoxicated, his affect and manner did not reveal any deficits in any understanding or the ability to recall and relay information. Not once did he express a desire to speak to a lawyer or indicate an unwillingness to speak to the police, except at the very end of the night when he indicated to . . . Patrizz that he no longer wanted to discuss the events. Prior to that interaction, he had at one point summoned . . . Bugbee to his room because it was his mistaken belief that officers wished to speak to him further and he wanted to answer their questions. Unlike the defendant [in *Mincey* v. *Arizona*, 437 U.S. 385, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978)], he was not tied to any tubes, needles or breathing apparatus.[4] He signed a consent to search form, listened to . . . Bugbee's verbal recitation of the written statement and had the mental wherewithal to make changes to that statement. He thanked . . . Bugbee for writing down his version of events.

"He was not seriously wounded and was not in danger of losing consciousness at any point. He was not prohibited from communicating with medical staff at any point, nor were medical staff prohibited from tending to him. No officer or medical personnel had any difficulty communicating with the defendant, nor did he express any difficulty understanding them or communicating with them.

"It is true that the defendant was intoxicated during his interactions with the police. It is this intoxication

[4] Our Supreme Court observed that, "[a]lthough the defendant had an IV inserted into the back of his hand, there is nothing in the record to suggest that the officers took advantage of what could have been a coercive situation created by [the] physical restraint placed on the defendant for purposes of medical treatment." (Internal quotation marks omitted.) *State* v. *Garrison*, supra, 350 Conn. 75; see also id., 77–78.

that prohibited him from leaving the hospital until 2:20 a.m. Further, he was never given *Miranda* warnings. However, these two factors by themselves are insufficient to defeat a finding of voluntariness. The state has met its burden of proof." (Footnote added.)

We now turn to the legal principles that govern this claim. "Irrespective of *Miranda*, and the fifth amendment itself . . . any use in a criminal trial of an involuntary confession is a denial of due process of law. . . . The state has the burden of proving the voluntariness of the confession by a fair preponderance of the evidence. . . . [T]he test of voluntariness is whether an examination of all the circumstances discloses that the conduct of law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined . . . . The ultimate test remains . . . [i]s the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process. . . . The determination, by the trial court, whether a confession is voluntary must be grounded upon a consideration of the circumstances surrounding it. . . . Factors that may be taken into account, upon a proper factual showing, include: the youth of the accused; his lack of education; his intelligence; the lack of any advice as to his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food and sleep. . . . Under the due process clause of the fourteenth amendment, however, in order for a confession to be deemed involuntary and thus inadmissible at trial, there must be police conduct, or official coercion, causally related to the confession . . . . In other words, there must be an essential link

between [the] coercive activity of the [s]tate, on the one hand, and a resulting confession by a defendant, on the other . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Christopher S.*, 338 Conn. 255, 280–81, 257 A.3d 912 (2021); *State* v. *Lueders*, 225 Conn. App. 612, 642–43, 317 A.3d 69, cert. denied, 349 Conn. 920, 321 A.3d 402 (2024); see also *State* v. *Madera*, 210 Conn. 22, 39–40, 554 A.2d 263 (1989).

"[T]here is considerable overlap between the factors that courts should consider in determining whether a defendant is in custody for *Miranda* purposes and the factors that courts should consider in determining whether a defendant's statements were voluntary." *State* v. *Jackson*, 304 Conn. 383, 421, 40 A.3d 290 (2012). Finally, we note that "[w]hether a confession is involuntary because it was coerced rests upon factual determinations regarding the circumstances surrounding the defendant's [statements]. . . . Although the ultimate question of voluntariness is one of law over which our review is plenary, the factual findings underpinning that determination will not be overturned unless they are clearly erroneous. . . . As in other cases in which the factual findings implicate a defendant's constitutional rights and the credibility of witnesses is not the primary issue, we will, however, undertake a scrupulous examination of the record to ensure that the findings are supported by substantial evidence." (Internal quotation marks omitted.) Id., 419–20; *State* v. *Lueders*, supra, 225 Conn. App. 643–44.

On appeal, the defendant does not expressly assert that any of the court's factual findings are clearly erroneous. Instead, he argues that, because he was intoxicated at the time he made the challenged statements and the police used deceptive tactics by suggesting to him that they believed his claim of self-defense, the totality of the circumstances compels a conclusion that his statements were not voluntary. We disagree.

First, we emphasize that many of the determinations made by our Supreme Court in rejecting the defendant's claim that he was in custody for purposes of *Miranda* support a similar conclusion that his statements were voluntary under the totality of the circumstances. See, e.g., *State* v. *Jackson*, supra, 304 Conn. 420–21; *State* v. *Marrero-Alejandro*, 159 Conn. App. 376, 396, 122 A.3d 272 (2015), appeal dismissed, 324 Conn. 780, 154 A.3d 1005 (2017). The defendant was not restrained by the police in any manner and was "able to get up from his hospital bed and walk around the room." *State* v. *Garrison*, supra, 350 Conn. 75. The questioning was "neither prolonged nor aggressive" and the defendant spoke to the officers "spontaneously, eagerly and immediately . . . ." (Internal quotation marks omitted.) Id., 74. Indeed, he thanked Bugbee for writing down his statement and made changes to the statement that he believed to be warranted. Id., 77. Moreover, the officers' interactions with the defendant were not prolonged but instead "were spaced out and totaled only about one hour . . . ." Id., 75. The police did not limit or otherwise condition the defendant's access to medical care on his compliance with their questioning. Id., 81. There is no evidence that he was deprived of food or water, or subject to the use of any other type of physical punishment. See, e.g., *State* v. *Adorno*, 45 Conn. App. 187, 191, 695 A.2d 6, cert. denied, 242 Conn. 904, 697 A.2d 688 (1997).

It is true that the defendant's blood alcohol level was elevated significantly during the time he was questioned. The court found, however, based in part on the testimony of the defendant's primary nurse, that the defendant was "alert, awake, and oriented . . . ." (Internal quotation marks omitted.) *State* v. *Garrison*, supra, 350 Conn. 79. Again, the defendant does not challenge as clearly erroneous this or any other factual

finding. Moreover, as the court properly noted, intoxication alone may be insufficient to defeat a finding of voluntariness. See, e.g., *State* v. *Madera*, supra, 210 Conn. 42. The defendant's hospital records, which were admitted into evidence, state that he was alert and speaking coherently. The defendant was not so intoxicated that he suffered from any mania, slipped in and out of consciousness, or lacked an ability to understand the questions he was being asked.[5] See *State* v. *Richard S.*, 143 Conn. App. 596, 615–17, 70 A.3d 1110, cert. denied, 310 Conn. 912, 76 A.3d 628 (2013); *State* v. *Russo*, 3 Conn. App. 137, 144–46, 485 A.2d 1335 (1985); see, e.g., *State* v. *Andrews*, 313 Conn. 266, 322–23, 96 A.3d 1199 (2014) (trial court may consider defendant's emotional state, intoxication, and mental disease to determine whether confession is voluntary; court nonetheless found defendant's claim of being under influence of drugs and in need of prescription medication was not credible and, therefore, properly denied motion to suppress statement as involuntary); *Parsad* v. *Greiner*, 337 F.3d 175, 183–84 (2d Cir.) (court's findings, that defendant had consumed numerous alcoholic beverages but he was not in such state of intoxication that he could not understand what he was doing when he made pre-*Miranda* statements, were not clearly erroneous, and fact that defendant was alcoholic was insufficient to render such statements involuntary), cert. denied sub nom. *Parsad* v. *Fischer*, 540 U.S. 1091, 124 S. Ct. 962, 157 L. Ed. 2d 798 (2003).

Finally, it is important to recognize that the court did not make any finding that the law enforcement officers who spoke to the defendant used any coercive police tactics. The only allegedly deceptive tactic on which the defendant relies is Bugbee's statement to him that

---

[5] The defendant instead relies on facts not in evidence by citing to an exhibit that was marked for identification only during the hearing on the motion to suppress.

he believed his claim of self-defense and he was unlikely to be charged with a crime.[6] Our Supreme Court has recognized, however, that such vague, predictive statements regarding how a suspect may be charged or treated by prosecuting authorities are not inherently coercive. See *State* v. *Griffin*, 339 Conn. 631, 680–81, 262 A.3d 44 (2021), cert. denied,      U.S.     , 142 S. Ct. 873, 211 L. Ed. 2d 575 (2022). Moreover, even in circumstances in which the police used multiple deceptive and coercive tactics, our Supreme Court has been disinclined to conclude that such trickery necessarily requires a conclusion that the defendant's will was overborne. See id., 672–73; see also *State* v. *Pinder*, 250 Conn. 385, 423, 736 A.2d 857 (1999).

In sum, we conclude that the court properly concluded that the state sufficiently demonstrated that the defendant's statements to law enforcement officers at the hospital, under the totality of the circumstances, were voluntary. Accordingly, we conclude that their admission at trial did not violate the due process clause of the federal constitution. The defendant's claim that the court improperly denied his motion to suppress, therefore, fails.

II

The defendant next claims that the court improperly denied his motion for sanctions in which he claimed that the state failed to comply with the court's discovery orders and its constitutional obligation to disclose impeachment evidence pursuant to *Brady* v. *Maryland*, supra, 373 U.S. 87, and *Giglio* v. *United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972). Specifically, the defendant asserts that the state improperly failed to disclose (1) that a condition of the victim's probation

---

[6] In his principal appellate brief, the defendant noted that two other police officers acknowledged their "familiarity with deceptive police interrogation tactics."

was that he consume no alcohol and (2) its agreement or understanding with the victim that the state did not intend to prosecute the victim for having violated his probation in exchange for the victim's cooperation in the prosecution of the defendant. He also asks this court to exercise its supervisory authority over the administration of justice to assure compliance with the state's discovery obligations. We are not persuaded by the defendant's arguments regarding this claim.

The following facts and procedural history are relevant to this claim. On the evening of the assault, the defendant knew that the victim was on probation and that a condition of his probation was to refrain from using alcohol.[7] Nevertheless, they spent time together drinking alcohol inside the apartment and later around a firepit. The defendant told the police officers while at the hospital that he knew that a condition of the victim's probation was that he not consume alcohol and the defendant's statements in this regard are captured on the officers' body worn camera footage. The video was provided to the defendant's counsel in November, 2018, when the defendant first filed a discovery request.

On December 4, 2018, the defendant filed supplemental discovery requests seeking a variety of information and material relating to the victim, including any records of conviction and documents related thereto, probation, and Department of Correction records, and "[a]ny . . . treatment reports, evaluations, sentencing materials, or other evidence in the state's possession . . . relevant to any defenses of [the defendant] or impeachment of [the victim]." The state indicated that it would comply, and, on December 21, 2018, the court

---

[7] The victim had been sentenced to three years of incarceration, execution suspended, and three years of probation on February 13, 2018. The conditions of his probation prohibited him from possessing or using drugs or alcohol.

ordered it to do so to the extent the records were available.

After the case was placed on the firm jury list, the defendant filed, inter alia, a "Motion to Complete Discovery," a "Motion for In Camera Review of Sealed Documents," and a "Memorandum in Support of Subpoena Duces Tecum." In one or more of these filings and proceedings related thereto, the defendant made representations that indicated he was aware of the victim's conviction history and that one or more of the criminal incidences underlying the convictions involved the victim's using alcohol to the point of intoxication. The defendant also indicated that he knew that the conditions of the victim's probation included restrictions on his consumption of alcohol.

On May 20, 2019, the defendant filed a motion for sanctions in which he asserted that the state had violated the court's December 21, 2018 discovery order and had failed to comply with its constitutional disclosure obligations set forth in *Brady* and *Giglio*. Specifically, the defendant's counsel argued, among other things, that he had learned independently that a condition of the victim's probation was that he not consume alcohol and that he was exposed to up to three years of incarceration if found to be in violation of his probation. The defendant's motion for sanctions also indicated that the state had decided not to seek a warrant for a violation of probation against the victim. The defendant sought a dismissal of the prosecution or, alternatively, other forms of relief including, but not limited to, the admission into evidence at trial of various records pertaining to the victim's criminal and substance abuse history.

Following oral argument[8] on the defendant's motion for sanctions, the court issued a memorandum of decision denying the motion. With respect to the victim's

---

[8] The defendant did not present any witnesses with respect to the motion but instead relied solely on an offer of proof and certain documents he had attached to his motion.

condition of probation, the court concluded that the state had not disclosed it to the defendant during discovery. Nevertheless, it concluded that it was unnecessary to decide whether such facts were material within the meaning of *Brady* because the information had not been suppressed. As the court stated: "The defendant himself was aware of the fact that the [victim] was not permitted to consume any alcohol while on probation. He [said] as much during his interactions with the police [on] the night of the incident. Defense counsel was able to confirm this by obtaining public records that listed the [victim's] conditions of probation. At the very least, the defendant knew at the time of the filing of this motion, the essential facts permitting him to take advantage of [that] evidence. . . . [T]he information is now known, by whatever source, to the defense. Evidence in this matter has not yet commenced, and the defendant has not shown how he has been prejudiced by this untimely disclosure or how it will deprive him of a fair trial. There is no *Brady* violation." (Citation omitted; internal quotation marks omitted.)

With respect to the state's alleged failure to disclose an agreement with the victim not to seek a violation of probation warrant, the court stated: "[I]f there existed an agreement or understanding—express or implied—between the state, a probation officer, any law enforcement agency, the [victim] or his lawyer that related to any benefit, positive outcome or consideration offered, suggested or implied to the [victim] in order to secure his testimony against the defendant, the state would be obligated to disclose that information. There is no evidence that any such discussion has occurred between any of the relevant parties. The claim is denied."

In conclusion, the court determined that the "defendant has not demonstrated that the evidence sought,

to the extent that it exists and is favorable, was disclosed in an untimely fashion and that the untimely disclosure has prejudiced him or deprived him of the right to a fair trial." The court did not explicitly address the defendant's claim that, even if the state's discovery conduct did not violate *Brady* and its progeny, sanctions still should be imposed on the state as a result of its noncompliance with the court's discovery order.[9] The defendant, however, failed to seek an articulation from the court regarding that issue.

We turn then to the legal principles that govern the defendant's *Brady* claim. "In *Brady* [v. *Maryland,* supra, 373 U.S. 86], the United States Supreme Court held that [t]he defendant has a right to the disclosure of exculpatory evidence under the due process [clause] of . . . [the fourteenth amendment to] the United States constitution . . . . *State* v. *Floyd*, 253 Conn. 700, 736–37, 756 A.2d 799 (2000)." (Internal quotation marks omitted.) *State* v. *Andres C.*, 349 Conn. 300, 329, 315 A.3d 1014, cert. denied,     U.S.     ,     S. Ct.     , L. Ed. 2d     (2024). "In order to prove a *Brady* violation, the defendant must show: (1) that the prosecution suppressed evidence after a request by the defense; (2) that the evidence was favorable to the defense; and (3) that the evidence was material." (Internal quotation marks omitted.) *State* v. *Floyd*, supra, 736–37. "It is well established that [i]mpeachment evidence as well

[9] Practice Book § 40-5 provides: "If a party fails to comply with disclosure as required under these rules, the opposing party may move the judicial authority for an appropriate order. The judicial authority hearing such a motion may enter such orders and time limitations as it deems appropriate, including, without limitation, one or more of the following: (1) Requiring the noncomplying party to comply; (2) Granting the moving party additional time or a continuance; (3) Relieving the moving party from making a disclosure required by these rules; (4) Prohibiting the noncomplying party from introducing specified evidence; (5) Declaring a mistrial; (6) Dismissing the charges; (7) Imposing appropriate sanctions on the counsel or party, or both, responsible for the noncompliance; or (8) Entering such other order as it deems proper."

as exculpatory evidence falls within *Brady*'s definition of evidence favorable to an accused." (Internal quotation marks omitted.) Id., 737; see also *Giglio* v. *United States*, supra, 405 U.S. 153–54. "Whether the [defendant] was deprived of his due process rights due to a *Brady* violation is a question of law, to which we grant plenary review." (Internal quotation marks omitted.) *Morant* v. *Commissioner of Correction*, 117 Conn. App. 279, 284, 979 A.2d 507, cert. denied, 294 Conn. 906, 982 A.2d 1080 (2009); see also *State* v. *Andres C.*, supra, 329–30.

"[I]t is well established that evidence is not considered to have been suppressed within the meaning of the *Brady* doctrine if the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of [that] evidence. . . . *State* v. *Skakel*, 276 Conn. 633, 701, 888 A.2d 985, cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed. 2d 428 (2006); see also *State* v. *Guilbert*, [306 Conn. 218, 272, 49 A.3d 705 (2012)] (same); *Young* v. *Commissioner of Correction*, 219 Conn. App. 171, 189, 294 A.3d 29 (same), cert. denied, 347 Conn. 905, 297 A.3d 567 (2023). The rationale underlying this exception to the state's disclosure obligation under *Brady* is obvious: *Brady* is designed to assure that the defendant is not denied access to exculpatory evidence known or available to the state but unknown or unavailable to him. . . . It is not intended either to relieve the defense of its obligation diligently to seek evidence favorable to it or to permit the defense to close its eyes to information likely to lead to the discovery of such evidence. . . . Thus, evidence will not be deemed to have been suppressed by the state . . . if the [defendant] or the [defendant's] trial counsel reasonably was on notice of [its] existence but nevertheless failed to take appropriate steps to obtain it." (Citation omitted; emphasis omitted; internal quotation marks omitted.) *Reyes* v. *State*, 222 Conn. App. 510, 533–34, 306 A.3d 5 (2023),

cert. denied, 348 Conn. 944, 307 A.3d 910 (2024); see also *State* v. *Giovanni P.*, 155 Conn. App. 322, 343, 110 A.3d 442, cert. denied, 316 Conn. 909, 111 A.3d 883 (2015).

As we noted previously, the defendant commented to the police on the night of the incident that he was aware of the victim's condition of probation that the victim was not to use alcohol. Additionally, in the defendant's May 20, 2019 memorandum of law in support of his motion for sanctions, he acknowledged that the victim had two prior convictions that resulted from conduct while he was intoxicated. The defendant's memorandum of law further stated: "A condition of probation for his most recent . . . conviction is that he not possess drugs or alcohol." The defendant also represented that, five days earlier, he had received transcripts from the victim's sentencing proceeding during which the prosecutor requested, as a special condition of probation, that the victim not use or possess any drugs or alcohol. At the hearing on his motion for sanctions, the defendant acknowledged that he had all of the information he had sought and would be able to prepare for the trial. On the basis of these facts, the trial court, in denying his motion for sanctions, determined that the defendant was aware of the victim's condition of probation that he refrain from consuming alcohol. Accordingly, the court found that this information was not suppressed and, thus, a *Brady* violation did not exist.

In his appellate brief, the defendant contends that the evidence showed only that he suspected that the victim was not permitted to drink alcohol due to the condition of his probation. We disagree. The court determined that the defendant was aware of the victim's condition of probation prior to trial. On the basis of this undisputed factual finding that the defendant and his counsel were aware of the conditions of the victim's

probation; see *State* v. *Skakel*, supra, 276 Conn. 702–703; *Reyes* v. *State*, supra, 222 Conn. App. 535–36; the court properly concluded that the defendant failed to establish a *Brady* violation.

The defendant also asserts that the state improperly failed to disclose its agreement or understanding with the victim that it did not intend to prosecute the victim for having violated his probation in exchange for his cooperation in the prosecution of the defendant. He further contends that, as a result, his decision to waive his right to trial by jury was unknowing and, therefore, involuntary. We disagree.

"[T]he *Brady* rule applies not just to exculpatory evidence, but also to impeachment evidence . . . which, broadly defined, is evidence having the potential to alter the jury's assessment of the credibility of a significant prosecution witness. . . . Thus, our case law has recognized that explicit agreements or understandings between a witness and the prosecutor or the police must be disclosed . . . but [a]n unexpressed intention by the state not to prosecute a witness does not." (Citations omitted; internal quotations omitted.) *Spearman* v. *Commissioner of Correction*, 164 Conn. App. 530, 578–79, 138 A.3d 378, cert. denied, 321 Conn. 923, 138 A.3d 284 (2016); see also *Gomez* v. *Commissioner of Correction*, 336 Conn. 168, 182, 243 A.3d 1163 (2020) (under *Brady* and its progeny, state may not suppress material, exculpatory evidence, including that which tends to undermine credibility of state's witnesses).

"The prerequisite of any claim under the *Brady*, *Napue* [v. *Illinois*, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959)] and *Giglio* line of cases[10] is the existence

---

[10] "Drawing from these cases, [our Supreme Court] has stated: [D]ue process is . . . offended if the state, although not soliciting false evidence, allows it to go uncorrected when it appears. . . . If a government witness falsely denies having struck a bargain with the state, or substantially mischaracterizes the nature of the inducement, the state is obliged to correct the

of an undisclosed agreement or understanding between the cooperating witness and the state. . . . Normally, this is a fact based claim to be determined by the trial court, subject only to review for clear error. . . . [T]he burden is on the defendant to prove the existence of undisclosed exculpatory evidence." (Citation omitted; footnote added; internal quotation marks omitted.) *Brown* v. *Commissioner of Correction*, 228 Conn. App. 309, 314, 324 A.3d 144, cert. denied, 350 Conn. 927, 326 A.3d 250 (2024); see also *State* v. *Smith*, 313 Conn. 325, 348–49, 96 A.3d 1238 (2014) (same).

In the present case, the court specifically found that there was no evidence of any discussion between the state and the victim regarding an agreement or understanding, express or implied, pertaining to "any benefit, positive outcome, or consideration offered, suggested or implied to the [victim] in order to secure his testimony against the defendant . . . ." Stated differently, the defendant has not set forth any evidence demonstrating that the state agreed, in exchange for the victim's cooperation, not to prosecute the victim for violating his probation by consuming alcohol on the night of his stabbing. The defendant has not challenged this finding on appeal. In the absence of such an agreement or understanding, this argument must fail.

Next, the defendant argues that the court improperly failed to sanction the state following its violation of the court's discovery orders. "Practice Book § 40-5 gives broad discretion to the trial judge to fashion an appropriate remedy for noncompliance with discovery. . . .

---

misconception. . . . Regardless of the lack of intent to lie on the part of the witness, *Giglio* and *Napue* require that the prosecutor apprise the court when he knows that his witness is giving testimony that is substantially misleading. . . . A new trial is required if the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury." (Internal quotation marks omitted.) *State* v. *Smith*, 313 Conn. 325, 348–49, 96 A.3d 1238 (2014).

[T]he primary purpose of a sanction for violation of a discovery order is to ensure that the defendant's rights are protected, not to exact punishment on the state for its allegedly improper conduct. As we have indicated, the formulation of an appropriate sanction is a matter within the sound discretion of the trial court. . . . In determining what sanction is appropriate for failure to comply with [court-ordered] discovery, the trial court should consider the reason why disclosure was not made, the extent of prejudice, if any, to the opposing party, the feasibility of rectifying that prejudice by a continuance, and any other relevant circumstances. . . . As with any discretionary action of the trial court, appellate review requires every reasonable presumption in favor of the action, and the ultimate issue is whether the trial court could reasonably conclude as it did. . . . In general, abuse of discretion exists when a court could have chosen different alternatives but has decided the matter so arbitrarily as to vitiate logic, or has decided it based on improper or irrelevant factors." (Citations omitted; internal quotation marks omitted.) *State* v. *Jackson*, 334 Conn. 793, 810–11, 224 A.3d 886 (2020); see also *State* v. *Hargett*, 196 Conn. App. 228, 256–58, 229 A.3d 1047 (2020), aff'd, 343 Conn. 604, 275 A.3d 601 (2022).

In denying the defendant's motion, the court did not expressly address his argument that sanctions against the state were warranted under our rules of practice for its failure to comply with the discovery orders. In declining to afford him any of the requested relief, the court implicitly denied this aspect of the defendant's May 12, 2019 motion for sanctions. In concluding that the court did not abuse its discretion, we first note that a trial court is not required to impose sanctions for every violation of a discovery order. See *State* v. *Billings*, 217 Conn. App. 1, 47, 287 A.3d 146 (2022), cert. denied, 346 Conn. 907, 288 A.3d 217 (2023). Additionally, the

defendant's counsel admitted that, as of the hearing on his motion for sanctions, he was in possession of all the materials that he had sought and would be able to prepare fully for trial. On appeal, the defendant has failed to demonstrate that the decision not to impose sanctions on the state constituted an abuse of the court's discretion. Finally, this court does not presume error by the trial court. See *State* v. *Herman K.*, 212 Conn. App. 592, 605, 275 A.3d 1233, cert. denied, 344 Conn. 902, 277 A.3d 136 (2022); *State* v. *James K.*, 209 Conn. App. 441, 465, 267 A.3d 858 (2021), aff'd, 347 Conn. 648, 299 A.3d 243 (2023). For these reasons, we reject the defendant's argument that the court improperly failed to impose sanctions on the state for violating its discovery order.

Finally, the defendant asserts, as an independent basis for reversal, that we should exercise our supervisory authority to assure the state's compliance with its disclosure obligations. Specifically, he contends that we should "direct trial courts to conduct a formal inquiry on the record with prosecutors during pretrial hearings to ascertain whether the state has exercised due diligence in locating favorable evidence and whether such evidence has been disclosed to the defense." We conclude that the use of our supervisory authority over the administration of justice is not warranted in the present case.

"It is well settled that [a]ppellate courts possess an inherent supervisory authority over the administration of justice. . . . Under our supervisory authority, we have adopted rules intended to guide the lower courts in the administration of justice in all aspects of the criminal process. . . . The exercise of our supervisory powers is an extraordinary remedy to be invoked only when circumstances are such that the issue at hand, [although] not rising to the level of a constitutional violation, is nonetheless of utmost seriousness, not only

for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole." (Citation omitted; internal quotation marks omitted.) *State* v. *Langston*, 346 Conn. 605, 637, 294 A.3d 1002 (2023), cert. denied,      U.S.     , 144 S. Ct. 698, 217 L. Ed. 2d 391 (2024); see also *State* v. *Moore*, 169 Conn. App. 470, 487, 151 A.3d 412 (2016) (supervisory powers are not last bastion of hope for every untenable appeal or form of free-floating justice untethered to legal principle), appeal dismissed, 334 Conn. 275, 221 A.3d 40 (2019).

The defendant has failed to demonstrate that this case presents the rare circumstance in which traditional constitutional, statutory, and procedural limitations are inadequate to protect the rights of the defendant and the integrity of the judicial system. See *State* v. *Lockhart*, 298 Conn. 537, 576, 4 A.3d 1176 (2010); see also *State* v. *Jose V.*, 157 Conn. App. 393, 408–409, 116 A.3d 833, cert. denied, 317 Conn. 916, 117 A.3d 854 (2015). We conclude, therefore, that this case does not merit the extraordinary remedy requested by the defendant.

The judgment is affirmed.

In this opinion the other judges concurred.